RAY v MASON COUNTY DRAIN COMMISSIONER

Docket No. 55,248. Submitted September 13, 1974 (Calendar No. 17). —Decided January 21, 1975.

A petition was submitted under the Drain Code to the Board of Determination of Necessity for widening, deepening, and straightening the present channels in the Black Creek Watershed in Mason County. The petition was accepted over the objections of many residents that the cost of the project and the detrimental effect on the environment resulting from the channelization should be considered. Edward Ray and others brought an action under the Environmental Protection Act against the Mason County Drain Commissioner. The Mason Circuit Court, Charles A. Wickens, J., ruled against the plaintiffs. The Court of Appeals, Danhof, P. J., and McGregor and Miles, JJ., affirmed (Docket No. 15090). Plaintiffs appeal. *Held:* The trial judge's findings of fact and conclusions of law clearly fail to meet the requirement of GCR 1963, 517, that the court shall find the facts specially, and fail to meet the requirements for findings of fact necessary to insure that the Environmental Protection Act fulfills those goals for which it was enacted.

48 Mich App 559; 210 NW2d 810 (1973) vacated.

OPINION OF THE COURT

1. TRIAL—NON-JURY CASES—FINDINGS OF FACT—COURT RULES.

Findings of fact stating that "[t]he plaintiffs do not sustain the burden of proof on this issue" and that "the burden is carried by a great volume of evidence in favor of the defendants" did not comply with the requirements of a court rule that in all actions tried upon the facts without a jury or with an advisory jury, the court shall find the fact specially; the rule demands

REFERENCES FOR POINTS IN HEADNOTES

[1, 2] 20 Am Jur 2d, Courts §§ 82–86.
    Power of court to prescribe rules of pleadings, practice, or procedure. 158 ALR 715.
[3–15] 61 Am Jur 2d, Pollution Control §§ 15, 115.

that the court's findings be sufficiently detailed to give an indication of the factual basis for the judge's conclusion (GCR 1963, 517.1).

2. TRIAL—NON-JURY CASES—FINDINGS OF FACT—COURT RULES—RE-MAND.

Upon a finding that a trial judge has failed to comply with the court rule which requires that in all actions tried upon the facts without a jury or with an advisory jury, the court shall find the fact specially, remanding the original record to the trial judge for preparation and certification of findings of fact is more appropriate than for the Supreme Court to hear the action *de novo* (GCR 1963, 517).

3. TRIAL—FINDINGS OF FACT—ENVIRONMENTAL PROTECTION ACT.

A trial judge's conclusory statement that the plaintiffs do not sustain the burden of proof on this issue does not measure up to the requirements for findings of fact necessary to insure that the Environmental Protection Act fulfills those goals for which it was enacted (MCLA 691.1201 *et seq.*).

4. HEALTH AND ENVIRONMENT—ENVIRONMENTAL PROTECTION ACT—LEGISLATIVE PURPOSE—DECLARATORY JUDGMENT—EQUITY.

The Environmental Protection Act provides private persons and other legal entities with standing to maintain actions in the circuit courts for declaratory and other equitable relief against anyone for the protection of the air, water, and other natural resources and the public trust therein from pollution, impairment, or destruction, empowers the circuit courts to grant equitable relief or impose conditions on the defendant that are required to protect the air, water, and natural resources, and also imposes a duty on individuals and organizations both in the public and private sectors to prevent or minimize degradation of the environment which is caused or is likely to be caused by their activities (MCLA 691.1201 *et seq.*).

5. HEALTH AND ENVIRONMENT—ENVIRONMENTAL PROTECTION ACT—POLLUTION—PUBLIC HEALTH—SAFETY—WELFARE.

The Environmental Protection Act prohibits pollution, destruction, or impairment of the environment unless it can be shown that there is no feasible and prudent alternative and that defendant's conduct is consistent with the promotion of public health, safety, and welfare in light of the state's paramount concern for the protection of its natural resources (MCLA 691.1203).

6. HEALTH AND ENVIRONMENT—ENVIRONMENTAL PROTECTION ACT—
   LEGISLATIVE PURPOSE—COMMON-LAW DEVELOPMENT.

   The Legislature, in establishing environmental rights by the
   Environmental Protection Act, did not set forth an elaborate
   scheme of detailed provisions, but spoke as precisely as the
   subject matter permits and left to the courts the task of giving
   substance to the standard by developing a common law of
   environmental quality (MCLA 691.1201 *et seq.).*

7. HEALTH AND ENVIRONMENT—ENVIRONMENTAL PROTECTION ACT—
   COMMON-LAW DEVELOPMENT.

   The Environmental Protection Act allows the courts to fashion
   standards in the context of actual problems as they arise in
   individual cases and to take into consideration changes in
   technology which the Legislature at the time of the act's
   passage could not hope to foresee (MCLA 691.1201 *et seq.).*

8. HEALTH AND ENVIRONMENT—ENVIRONMENTAL PROTECTION ACT—
   FINDINGS OF FACT.

   To satisfy the requirements for findings of fact under the Envi-
   ronmental Protection Act, a trial judge should consider and,
   where appropriate, make findings of fact with regard to each of
   the following: (1) how the plaintiff has established a prima facie
   case that the defendant's conduct "has, or is likely to pollute,
   impair or destroy" air, water or other natural resources or how
   he has failed to establish a case; (2) how defendant has rebutted
   plaintiffs' prima facie case or how he has failed to; (3) how
   defendant has established as an affirmative defense that there
   is no feasible and prudent alternative and that his conduct is
   consistent with the promotion of the public health, safety, and
   welfare or how he has failed to establish a defense (MCLA
   691.1201 *et seq.).*

9. HEALTH AND ENVIRONMENT—ENVIRONMENTAL PROTECTION ACT—
   PROBABLE DAMAGE.

   Under the Environmental Protection Act, a showing that the
   defendant's conduct has polluted, impaired, or destroyed, or is
   likely to pollute, impair or destroy, the air, water or other
   natural resources, is not restricted to actual environmental
   degradation but encompasses probable damage to the environ-
   ment as well (MCLA 691.1201 *et seq.).*

10. HEALTH AND ENVIRONMENT—ENVIRONMENTAL PROTECTION ACT—
    PRIMA FACIE CASE—EVIDENCE.

    The general rules of evidence govern with regard to plaintiffs'

burden of establishing a prima facie case under the Environmental Protection Act (MCLA 691.1201 *et seq.*).

11. HEALTH AND ENVIRONMENT—ENVIRONMENTAL PROTECTION ACT— FINDINGS—PRIMA FACIE CASE.

A trial judge in his findings in an action under the Environmental Protection Act should indicate whether or not the plaintiff has met the burden of establishing a prima facie case, referring to the facts supporting his conclusion (MCLA 691.1201 *et seq.*).

12. HEALTH AND ENVIRONMENT—ENVIRONMENTAL PROTECTION ACT— PRIMA FACIE CASE—REBUTTAL.

Under the Environmental Protection Act, once the plaintiff has established a prima facie case, the defendant may elect to rebut the prima facie showing by the submission of evidence to the contrary and if the defendant offers evidence in rebuttal the judge must indicate those facts put in evidence which led him to conclude that the defendant has or has not successfully rebutted plaintiffs' prima facie case (MCLA 691.1201 *et seq.*).

13. HEALTH AND ENVIRONMENT—ENVIRONMENTAL PROTECTION ACT— POLLUTION—BURDEN.

While the burden of proving environmental pollution or impairment remains with the plaintiff under the Environmental Protection Act, the burden of going forward with the evidence shifts to the defendant once the plaintiff establishes a prima facie case and, if the defendant successfully rebuts, the burden of going forward with the evidence would then shift back to the plaintiff (MCLA 691.1201 *et seq.*).

14. APPEAL AND ERROR—FINDINGS OF FACT—CONCLUSIONS OF LAW— COURT RULES—ENVIRONMENTAL PROTECTION ACT.

A case is remanded to the trial court for further findings where the three-sentence findings of fact and conclusions of law clearly fail to meet the requirements of either the court rules or the Environmental Protection Act (GCR 1963, 517; MCLA 691.1201 *et seq.*).

CONCURRING OPINION

T. G. KAVANAGH, C. J.

15. TRIAL—FINDINGS OF FACT—ENVIRONMENTAL PROTECTION ACT— LAW OF THE CASE.

*The detailed discussion in this opinion of findings of fact in a case under the Environmental Protection Act is offered as a suggestion and not a limitation or inhibition on the fact finder.*

*Wheeler, Upham, Bryant & Uhl* (by *Robert H. Gillette),* for plaintiffs.

*Chester C. Pierce (Miller, Canfield, Paddock & Stone [by Charles L. Burleigh, Jr.],* of counsel), for defendant.

Amici Curiae: *Roger L. Conner,* for West Michigan Environmental Action Council & University of Michigan Environmental Law Society.

WILLIAMS, J. This is a significant case of first impression relating to Michigan's world-famous Environmental Protection Act (EPA).[1] The question involved is the kind of findings of fact required of the trial judge by GCR 1963, 517 and § 3(1) of the EPA in deciding an action brought under the EPA.

In the instant case the trial judge failed to make specific findings of facts. Rather than attempt a review *de novo,* we remand for full and specific findings of fact under *Dauer v Zabel,* 381 Mich 555, 558; 164 NW2d 1 (1969). To assist the trial judge, especially since this is a case of first impression, we set forth considerations and guidelines for proper findings of fact.

In light of the remand order, it is inappropriate to consider the other issues raised on appeal at this time.

---

[1] MCLA 691.1201 *et seq.;* MSA 14.528(201) *et seq.* "The Michigan Environmental Protection Act was the first statute to provide for citizen suits to protect the environment from degradation by either public or private entities and to provide a broad scope for court adjudication. The Federal Clean Air Act and Water Pollution Control Amendments, as well as several state statutes, have followed the Michigan Act's lead." Sax & DiMento, *Environmental Citizen Suits: Three Years' Experience Under The Michigan Environmental Protection Act,* 4 Ecology LQ 1 (1974).

## I —Facts

This action was brought by 70% of the landowners in the Black Creek Watershed in Mason County and by an additional group of six persons who joined the suit solely with regard to the environmental issues. Plaintiffs-appellants seek to enjoin the Mason County Drain Commissioner, defendant-appellee, from proceeding with a channelization program for the watershed and from assessing them for any part of the cost of the project.[2] The Black Creek Watershed consists of 6,678 acres of relatively flat land, which was once used primarily for agricultural purposes, but in which today only a small number of the parcels are actively farmed.

The area contains a biologically unique "quaking forest," swamps and potholes, and scattered, wooded areas which serve as a refuge for a wide variety of wildlife.

The existing system of open drains is inadequate to control flooding which occurs in the springtime and which inundates some 100 acres for periods up to three weeks. Apparently, such flooding does not pose health or safety hazards, but does cause some crop damage. In 1960 two farmers requested assistance of the Mason County Soil Conservation District in correcting the drainage problem. The District along with the Drain Commissioner applied for Federal funds under 16 USC 1001 *et seq.,* a cost-sharing program which makes funds available for flood control.

The Soil Conservation Service, which administers the Federal program, reviewed the application

---

[2] The appellants seek to enjoin only that portion of the flood control program concerning the channelization of existing drains and not that portion of the plan relating to clearing and improving road drain culverts.

and proposed massive modifications and changes in the existing drainage system. The plan, as it ultimately developed, called for widening, deepening, and straightening the present channels. Dredging will result in the accumulation of tons of "spoils" which will be disposed of by heaping it on the banks of the channel reaching from 24 to 30 feet outward from the channel.

Proceedings were conducted under the Michigan Drain Code of 1956, MCLA 280.1 *et seq.;* MSA 11.1001 *et seq.* and on July 1, 1965 the Board of Determination of Necessity found that the proposed work plan was unnecessary. However, one year later a second petition was submitted and accepted over the objections of many residents that the cost of the project and the detrimental effect on the environment resulting from the channelization plan should be considered.

In May, 1971 the Drain Commissioner sent out notices that bids would be received on June 17, 1971, and set July 17, 1971 as the date for reviewing individual assessments. Construction began in October, 1971, at a projected cost of $213,990.70, of which $37,000 would be assessed against the individual landowners, and consisted initially of preliminary clearing work. Bond issues of $100,000, secured by Mason County, were to go on sale November 18, 1971. On November 17, 1971 the plaintiffs filed suit.

The trial court on August 22, 1972 ruled against the plaintiffs on each of the six counts in the complaint and the Court of Appeals affirmed on July 25, 1973 and we granted leave on December 27, 1973, 391 Mich 753 (1973). We remand for findings of fact, for without such findings we can in no way consider the merits of this case.

## II —Inadequate Findings of Facts

Count I of plaintiffs' complaint alleged that numerous and substantial forms of environmental degradation would result from the proposed Black Creek Watershed Project. Both sides presented their case on the environmental issues, calling both expert and lay witnesses to testify, as well as introducing many documents, reports and maps into evidence during the trial, which lasted two days.

The trial judge's entire findings of fact on the issues raised and the evidence introduced relating to the environmental questions was restricted to the following language:

"Count I is based upon MCLA 691.1202 (Environmental Protection Act), claiming the proposed project will pollute and destroy the natural resources in the area as well as increase the pollution of the Pere Marquette River and Lake Michigan, downstream from the proposed project. *The plaintiffs do not sustain the burden of proof on this issue. In fact, the burden is carried by a great volume of evidence in favor of the defendants and, therefore, Count I is denied."* (Emphasis added.)

## III —GCR 1963, 517 Requirements

The trial judge's conclusory statement relating to plaintiffs' Count I obviously does not comply with the requirements of GCR 1963, 517.1, which reads in pertinent part:

"In all actions tried upon the facts without a jury or with an advisory jury, the court *shall find the fact specially* and state separately its conclusions of law thereon and direct the entry of the appropriate judgment. It will be sufficient if the court makes brief, definite, and pertinent findings and conclusions upon the contested matters without over elaboration of detail

or particularization of facts. If an opinion or memorandum decision is filed, it will be sufficient if the findings and conclusions appear therein." (Emphasis added.)

What is required under GCR 1963, 517 will vary somewhat with the type of case and the nature of the fact questions involved, but at the very least GCR 1963, 517 demands that the court's findings be sufficiently detailed to give an indication of the factual basis for the judge's conclusion. Honigman & Hawkins, respected commentators on Michigan laws of procedure, making the following observations with regard to the requirements of GCR 1963, 517:

"The findings of fact must include as much of the subsidiary facts as is necessary to disclose the steps by which the trial court reached its ultimate conclusion on each factual issue. The findings should be made at a level of specificity which will disclose to the reviewing court the choices made as between competing factual premises at the critical point that controls the ultimate conclusion of fact. That is, at the point where a given choice as to the concrete facts leads inevitably to the ultimate conclusion, the findings should disclose the choice which was made, so that the appellate court may test the validity of its evidentiary support." 2 Honigman & Hawkins, Michigan Court Rules Annotated (2d ed), p 594.

The trial judge's statement on plaintiffs' Count I merely summarized the plaintiffs' environmental challenges and concluded that the plaintiffs have not met their burden of proof. We are not given any clue as to which facts brought out during the trial led the judge to his ultimate conclusion. Consequently we remand this action to the trial court for more complete and specific findings of facts.

Plaintiffs are correct in asserting that as an alternative to remand this Court could hear the action *de novo.* However, the more appropriate disposition upon a finding that the trial judge has failed to comply with GCR 1963, 517 is to remand the original record to the trial judge "for preparation and certification of findings of fact". *Dauer v Zabel,* 381 Mich 555, 558; 164 NW2d 1 (1969).

We would be ill-advised to assume the responsibilities charged to the trial judge. As Justice T. M. KAVANAGH, in speaking for the Court, said:

"[T]his Court is not in as good a position as the trial chancellor to determine what the facts are with respect to conflicting testimony. This Court in numerous cases has so indicated. The trial chancellor heard the witnesses, observed their demeanor on the stand, and was in the best position to determine their credibility and to conclude what the facts in the case really were. While this Court tries chancery cases *de novo,* it gives great weight to the findings of the trier of the facts, particularly where there is conflict in the testimony. This Court should not substitute its judgment for that of the chancellor." *Martin v Arndt,* 356 Mich 128, 140; 95 NW2d 858 (1959).

## IV —Environmental Protection Act

The necessity for remand stems not only from the failure to comply with GCR 1963, 517; the trial judge's conclusory statement does not measure up to the requirements for findings of fact necessary to insure that the EPA fulfills those goals for which it was enacted.

As mentioned previously, standards for acceptable findings of facts will vary somewhat with the nature of the action and the particular type of facts at issue. In order to properly visualize the type of findings of facts required under the EPA, it

is important to first have an overview of the purposes and specifications of EPA.

Michigan's Environmental Protection Act marks the Legislature's response to our constitutional commitment to the "conservation and development of the natural resources of the state * * * ".[3] Const 1963, art 4, § 52 in its entirety reads:

"Section 52. The conservation and development of the natural resources of the state are hereby declared to be of paramount public concern in the interest of the health, safety and general welfare of the people. *The legislature shall provide for the protection of the air, water and other natural resources of the state from pollution, impairment and destruction.*" (Emphasis added.)

Michigan's EPA was the first legislation of its kind and has attracted worldwide attention.[4] The act also has served as a model for other states in

---

[3] Const 1963, art 4, § 52. *See State Highway Commission v Vanderkloot,* 392 Mich 159, 178–184; 220 NW2d 416 (1974) (opinion of WILLIAMS, J.) for further discussion on the constitutional mandate and the legislative response to the commitment of a cleaner environment.

[4] The passage of the act received worldwide press coverage:

"TIME, 24 August 1970, p 37; New York Times, 3 August 1970, p 36, col 2; Le Courrier (UNESCO), July, 1971, p 20; Proceedings, International Symposium on Environmental Disruption, Tokyo, 1970 (Asahi Evening News, Tokyo)" Brief Amicus Curiae, p 3.

Michigan's EPA has also received considerable attention in legal periodicals. An insight into the act's political background may be found in Watts, *Michigan Environmental Protection Act,* 4 JL Reform 358 (1970). An analysis of the act's major provisions is found in *Michigan Environmental Protection Act of 1970,* 4 JL Reform 121 (1970). Two articles have monitored actions brought under the act since its passage: Sax & Conner, *Michigan's Environmental Protection Act of 1970: A Progress Report,* 70 Mich L Rev 1003 (1972); and Sax & DiMento, *Environmental Citizen Suits: Three Years' Experience Under the Michigan Protection Act,* 4 Ecology LQ 1 (1974).

Not every one has viewed the act with unqualified enthusiasm. An article by Joseph H. Thibodeau, former Legal Advisor to Governor William Milliken, sets out a number of reservations concerning the act. Thibodeau, *Michigan's Environmental Protection Act of 1970: Panacea or Pandora's Box,* 48 J Urban L 564 (1971).

formulating environmental legislation.[5] The enact-
ment of the EPA signals a dramatic change from
the practice where the important task of environ-
mental law enforcement was left to administrative
agencies without the opportunity for participation
by individuals or groups of citizens.[6] Not every
public agency proved to be diligent and dedicated
defenders of the environment.[7] The EPA has pro-
vided a sizable share of the initiative for environ-
mental law enforcement for that segment of soci-
ety most directly affected—the public. *Daniels v
Allen Industries,* 391 Mich 398, 410–411; 216
NW2d 762 (1974).

The act provides private individuals and other
legal entities with standing to maintain actions in
the circuit courts for declaratory and other equita-
ble relief against anyone "for the protection of the
air, water and other natural resources and the
public trust therein from pollution, impairment or
destruction". MCLA 691.1202(1); MSA 14.528-
(202)(1).

The act also empowers the circuit courts to
grant "equitable relief or * * * impose conditions
on the defendant that are required to protect the

[5] To date six states have adopted environmental legislation employ-
ing language similar to that found in Michigan's EPA:

Minn Stat Ann §§ 116B.01–116B.13 (Supp 1973); Mass Ann Laws, ch
214, § 10A (Supp 1972); Conn Gen Stat Ann §§ 22a-14 to 22a-20 (Supp
1973); SD Comp Laws Ann §§ 21-10A-1 to 21-10A-15 (Supp 1973); Fla
Stat Ann § 403.412; Ind Ann Stat §§ 13-6-1-1 to 13-6-1-6 (1973). Sax &
DiMento, *Environmental Citizen Suits: Three Years' Experience Un-
der The Michigan Environmental Protection Act,* 4 Ecology LQ 1, 2
(1974).

[6] Joseph L. Sax, author of the EPA's first draft, portrays this
dilemma vividly in his book *Defending the Environment* (Knopf 1971).

[7] For those public agencies committed to protecting our environ-
ment, the EPA has proven to be an invaluable weapon in the fight
against the degradation of our environment. *See* Sax & Conner,
*Michigan's Environmental Protection Act of 1970: A Progress Report,*
70 Mich L Rev 1003, 1050–1051 (1972); and Sax & DiMento, *Environ-
mental Citizen Suits: Three Years' Experience Under the Michigan
Environmental Protection Act,* 4 Ecology LQ 1 (1974).

air, water and natural resources * * * ". MCLA 691.1204(1); MSA 14.528(204)(1).

But the EPA does more than give standing to the public and grant equitable powers to the circuit courts, it also imposes a duty on individuals and organizations both in the public and private sectors to prevent or minimize degradation of the environment which is caused or is likely to be caused by their activities.[8] The EPA prohibits pollution, destruction, or impairment of the environment unless it can be shown that "there is no feasible and prudent alternative" and that defendant's conduct "is consistent with the promotion of public health, safety and welfare in light of the state's paramount concern for the protection of its natural resources * * * ". MCLA 691.1203; MSA 14.528(203).

The Legislature in establishing environmental rights set the parameters for the standard of environmental quality but did not attempt to set forth an elaborate scheme of detailed provisions designed to cover every conceivable type of environmental pollution or impairment. Rather the Legislature spoke as precisely as the subject matter permits[9] and in its wisdom left to the courts the important task of giving substance to the standard by developing a common law of environmental quality.[10] The act allows the courts to

---

[8] Joseph L. Sax, author of the EPA's first draft, states that the act allows one "to assert that his right to environmental quality has been violated in much the same way that one has always been able to claim that a property or contract right has been violated". Sax & Conner, *Michigan's Environmental Protection Act of 1970: A Progress Report,* 70 Mich L Rev 1003, 1005 (1972). *See also* discussion on this point in *State Highway Commission v Vanderkloot,* 392 Mich 159, 184–185; 220 NW2d 416 (1974), opinion of WILLIAMS, J.

[9] *Cf. Osius v St Clair Shores,* 344 Mich 693, 698; 75 NW2d 25 (1956).

[10] Thomas J. Anderson, one of the legislative sponsors of the EPA underscored this purpose when he said that the EPA should:

"permit courts to develop a common law of environmental quality,

fashion standards in the context of actual problems as they arise in individual cases and to take into consideration changes in technology which the Legislature at the time of the act's passage could not hope to foresee.

## V —Finding of Facts Under the EPA

The judicial development of a common law of environmental quality, as envisioned by the Legislature, can only take place if circuit court judges take care to set out with specificity the factual findings upon which they base their ultimate conclusions. If the circuit court judges fail to provide adequate findings of fact, not only will the immediate parties remain in the dark as to why they won or lost, but courts confronted with similar questions in the future will be denied the benefit of other courts' deliberations, those who seek in good faith to comply with the mandate of the EPA will be without a precise standard against which to measure their conduct, and appellate courts will be unable to determine those instances in which the trial judge has failed to carry out the Legislature's intent. In the final analysis the very efficacy of the EPA will turn on how well circuit court

much as courts have developed a right to privacy." Press Release, Representative Thomas J. Anderson *Michigan Passes Landmark Environmental Law,* 2 July 1970. Brief Amicus Curiae, p 6. While the language of the statute paints the standard for environmental quality with a rather broad stroke of the brush, the language used is neither illusive nor vague. "Pollution", "impairment" and "destruction" are taken directly from the constitutional provision which sets forth this state's commitment to preserve the quality of our environment. In addition these and other terms used in establishing the standard have acquired meaning in Michigan jurisprudence. The development of a common law of environmental quality under the EPA is no different from the development of the common law in other areas such as nuisance or torts in general, and we see no valid reason to block the evolution of this new area of common law.

judges meet their responsibility for giving vitality
and meaning to the act through detailed findings
of fact.

The act itself offers substantial guidance to trial
judges regarding what should be included in the
findings of fact for actions brought under the EPA.
Section 3(1) of the act reads:

"When the plaintiff in the action has made a prima
facie showing that the conduct of the defendant has, or
is likely to pollute, impair or destroy the air, water or
other natural resources or the public trust therein, the
defendant may rebut the prima facie showing by the
submission of evidence to the contrary. The defendant
may also show, by way of an affirmative defense, that
there is no feasible and prudent alternative to defend-
ant's conduct and that such conduct is consistent with
the promotion of the public health, safety and welfare
in light of the state's paramount concern for the protec-
tion of its natural resources from pollution, impairment
or destruction. Except as to the affirmative defense, the
principles of burden of proof and weight of the evidence
generally applicable in civil actions in the circuit courts
shall apply to actions brought under this act."

To satisfy the requirements for findings of fact
under the EPA, the trial judge should consider,
and where appropriate make, findings of fact with
regard to each of the following:

1) How the plaintiff has established a prima
facie case that the defendant's conduct "has, or is
likely to pollute, impair or destroy the air, water
or other natural resources" or how he has failed
to.

2) How defendant has rebutted plaintiffs' prima
facie case with evidence to the contrary, or how he
has failed to.

3) How defendant has established as an affirma-
tive defense that "there is no feasible and prudent
alternative * * * and that such conduct is consist-

ent with the promotion of the public health, safety and welfare in light of the state's paramount concern for the protection of its natural resources from pollution, impairment or destruction", or how he has failed to.

## A. Prima Facie Case of Pollution

The trial judge must find the facts on which the plaintiff claims to have made a prima facie case under § 3(1), namely that the defendant's conduct "has, *or is likely* to pollute, impair or destroy the air, water or other natural resources". (Emphasis added.) Such a showing is not restricted to actual environmental degradation but also encompasses probable damage to the environment as well.

Obviously the evidence necessary to constitute a prima facie showing will vary with the nature of the alleged environmental degradation involved. However, the trial judge is not without guidelines for making such a determination. Section 3(1) of the act provides:

"Except as to the affirmative defense, the principles of burden of proof and weight of the evidence generally applicable in civil actions in the circuit courts shall apply to actions brought under this act."

Thus with regard to plaintiffs' burden of establishing a prima facie case general rules of evidence govern. In *Gibbons v Farwell,* 63 Mich 344, 348; 29 NW 855 (1886), this Court characterized a prima facie case as that case sufficient to withstand a motion by the defendant that the judge direct a verdict in the defendant's favor. Black's Law Dictionary defines a prima facie case in the following manner:

"A litigating party is said to have a *prima facie* case when the evidence in his favor is sufficiently strong for

his opponent to be called upon to answer it. A *prima facie* case, then, is one which is established by sufficient evidence, and can be overthrown only by rebutting evidence adduced on the other side." Black's Law Dictionary (4th ed), p 1353.

. The trial judge in his findings should indicate whether or not the plaintiff has met this burden of establishing a prima facie case, referring to the facts supporting his conclusion.[11]

## B. Rebuttal by Defendant of Plaintiffs' Prima Facie Case

Once the plaintiff has established a prima facie case, the defendant may elect to "rebut the prima facie showing by the submission of evidence to the contrary". If the defendant offers evidence in rebuttal the judge, must indicate those facts put in evidence which led him to conclude that the de-

---

[11] In an effort to establish a prima facie showing under the act, the plaintiffs in the instant action produced testimony *inter alia* from a hydrologist that the water table of the land adjacent to the channel would be lowered as a result of the proposed channelization project. This witness maintained that without proper tests it would be impossible to determine whether the surrounding wetlands were dependent upon the water table such that a lowering of the water table would result in the drying up of wetlands in the area. One of the plaintiffs, a former conservation instructor, described the wetlands, including a biologically unique "quaking forest" which potentially could be destroyed by the proposed project. A zoology professor discussed the desirability of preserving the bogs and marshes in order to maintain a diversified natural area for the wildlife. Residents of the area affected testified the project would remove needed water, destroy woodlands, and disfigure the existing country stream-like channel, leaving mounds of unsightly spoil. Evidence also was introduced suggesting that the project would adversely affect the Pere Marquette River.

In his disposition of the environmental questions raised in this case, the trial judge made no reference to any of these or other proofs. It is impossible to ascertain from his conclusory statement whether he believes the plaintiffs made a prima facie showing or not. This deficiency must be corrected on remand. It should be noted here that defendant concedes on appeal before this Court that "the proofs show clearly that plaintiffs-appellants did make out a prima facie cause for impairment of natural resources under Section 3(1)".

fendant has or has not successfully rebutted plaintiffs' prima facie case.

In determining whether the defendant has successfully rebutted plaintiff's case the trial court should look, as § 3(1) of the EPA directs, to the general rules of evidence. In *Douglas Shoe Co v Pere Marquette R Co,* 241 Mich 297, 301; 217 NW 12 (1928), this Court set forth the following principle:

"To recover, the plaintiff must prove it by a preponderance of evidence. The burden of proof never shifts. But the burden of proceeding shifts to the defendants if the plaintiff makes a *prima facie* case."

Thus, while the burden of proving environmental pollution or impairment remains with the plaintiff, the burden of going forward with the evidence shifts to the defendant once the plaintiff establishes a prima facie case. If the defendant successfully rebuts, the burden of going forward with the evidence would then shift back to the plaintiff.

The nature of the evidence necessary to rebut plaintiff's showing will vary with the type of environmental pollution, impairment or destruction alleged and with the nature and amount of the evidence proffered by the plaintiff. In some cases, no doubt, testimony by expert witnesses may be sufficient to rebut plaintiff's prima facie showing. While in other actions the defendant may find it necessary to bring forward field studies, actual tests, and analyses which support his contention that the environment has not or will not be polluted, impaired or destroyed by his conduct. Such proofs become necessary when the impact upon the environment resulting from defendant's conduct cannot be ascertained with any degree of reasonable certainty absent empirical studies or

tests.[12] For example, in this case one of defendants' witnesses, a conservation engineer, conceded that without a detailed study of the configurations in the area he could not say how the wetlands were dependent upon the water table and whether they were subject to drying up if the water table were lowered.

### C. Feasible and Prudent Alternatives

As an alternative to submitting evidence to rebut plaintiff's prima facie case, "[t]he defendant may also show, by way of an affirmative defense that, that there is no feasible and prudent alternative to defendant's conduct *and* that such conduct is consistent with the promotion of the public health, safety and welfare". If the defendant rather than, or in addition to, attempting to rebut plaintiff's case seeks to establish an affirmative defense, then the judge must set out those facts which led him to conclude 1) that "feasible and

---

[12] In the instant action the defendant offered in rebuttal to plaintiffs' case the testimony of an agronomist who stated that in his opinion the wetlands would not dry up as a result of the channelization project. However, a conservation engineer who testified for the defendant conceded in a deposition taken by the plaintiffs that absent a detailed study of the soil configurations in the area he could not say whether the wetlands were dependent upon the water table and consequently might dry up if the water table was lowered. Testimony received at the trial and in depositions indicated that no such study of the area had been made.

A wildlife biologist testified for the defendant and maintained that when completed the project might enhance rather than destroy the wildlife habitat. Evidence was received suggesting that the project would benefit agricultural output and that spoil dredged from the widening and deepening of the channel would be seeded with grass. Defendant's witnesses also testified that the project would lessen rather than increase the degrading effects of the Black Creek flow into the Pere Marquette River and that the Pere Marquette's flood level would not be adversely affected by the project.

Assuming the plaintiffs made a prima facie showing, the trial judge failed to indicate whether this and other evidence introduced by the defendant was sufficient to constitute a rebuttal of plaintiffs' case. On remand the trial judge should address himself to this issue and set forth the facts supporting his conclusion.

prudent alternatives" do or do not exist and what the claimed alternatives were and 2) that the defendant's conduct is or is not "consistent with the promotion of public health, safety and welfare".

Since the defendant does not appear to have attempted to establish an affirmative defense and since neither the trial judge nor the Court of Appeals has spoken to the issue, this Court will not at the present time consider the matter further.

## VI —Conclusion

The three-sentence findings of facts and conclusions of law, from our discussion so far, clearly fail to meet either the requirements of GCR 1963, 517 or the EPA. The matter is therefore remanded to the trial court for further findings not inconsistent with this opinion.

Because of the novelty of the matter two further points are made. First, although plaintiffs and defendant were afforded proper opportunity to submit summaries at the conclusion of the trial, in light of our examination of the requirements of GCR 1963, 517 and the EPA, both sides may submit proposed findings of facts and conclusions of law within such reasonable time as the trial court shall prescribe. Second, the attention of the parties and the trial court is directed to the matter in neighboring Emmet County, *Irish v Green,* No. 162-3, July 15, 1972. While the opinion is set out in 4 Environment Reporter Cases 1402, that the matter may be more immediately and conveniently available, the opinion is set out in full in the appendix, not in any way approving or disapproving the conclusions therein reached but merely to illustrate the type of detailed findings of

fact appropriate to comply with the requirements of GCR 1963, 517 and the EPA.

We vacate the decision of the Court of Appeals and remand the original record to the trial court for preparation and certification of findings of fact conforming with the requirements of GCR 1963, 517, the EPA and this opinion. We do not retain jurisdiction. No costs, a public question of first impression being involved.

T. M. KAVANAGH, SWAINSON, LEVIN, M. S. COLEMAN, and J. W. FITZGERALD, JJ., concurred with WILLIAMS, J.

### APPENDIX

Opinion of Circuit Judge Allan C. Miller, *Irish v Green,* Emmet County Circuit Court, No 162-3, July 15, 1972:

MILLER, J:

This of course is a proceeding in the nature of a bill in equity filed under Act 127 of the Public Acts of 1970, commonly known as the Environmental Protection Act. M.C.L.A. 691.1201 et seq., M.S.A. 14.528(201) et seq., for declaratory and equitable relief for protection of the air, water and other natural resources and the public trust therein, pertaining here to a large residential housing project proposed for West Traverse Township, Emmet County, Michigan.

The project has been described by the president of the corporate developer defendant as including 745 residential units on twelve hundred acres, more or less, approximately three miles north of Harbor Springs and near the mouth of Little Traverse Bay as it opens into Lake Michigan.

The area is probably the choice vacation land in a state comprising many fine vacation areas.

The developer secured approval of the local and state authorities for its Plat No. 1 containing a hundred and some lots. These authorities generally have been made defendants in the proceeding but, except for the various departments of the state, have not participated in the trial. The Attorney General of Michigan has defended the proceedings in behalf of the departments.

At the time of filing this proceeding the developer defendant had procured all but the final approval of Plat No. 1, and the Court on the temporary hearing held May 1st and 2nd, 1972, permitted the defendant Department of Treasury to grant such approval. The Court conditioned the easing of the restraining order upon the deposit by the defendant developer of fifteen percent of sales proceeds for use as an escrow for utilities if finally ordered.

The final approval of Plat No. 1 was granted May 22, 1972, and is Exhibit F in these proceedings. The entire project is shown by a topographical map marked in evidence several times, with different notations thereon, as Exhibits 2, 12, J and N.

The local and state authorities reviewed Plat No. 1 and approved it, considering at the same time the over-all project, but without final approval of the subsequent filings.

The project was challenged initially on four grounds, two of which were dismissed at earlier stages.

One ground was that an Environmental Impact Statement was required prior to plat approval, and request was made for remand to the appropriate administrative agencies for hearing. This Court

ruled that a remand was without merit as the Court would ultimately be required to make the decision in any event. Furthermore, the Court ruled as a matter of law that the Executive Orders apply only to state actions per se and not to state agency approval of private action. Thus Count III of the complaint was dismissed.

Another count of the complaint dealt with the assertion that defendant developer should proceed with a "cluster" type development. The Court sustained objections to this evidence and it was taken only on a separate record. At the close of the plaintiffs' proofs the motion to dismiss this Count II was granted for failure to state a cause of action. The defendant developer's project either violates the act or does not. Plaintiffs have no right to invade property rights to the extent of dictating alternative developments which may or may not have market appeal.

This leaves two counts and three complex legal and factual issues to be resolved.

As noted above, in addition to two full days of testimony at the time of the temporary hearing, which testimony was by stipulation incorporated as part of the trial, and in addition to five depositions which were received in evidence and read by the Court, five full (9:00 a.m. to 6:00 p.m. more or less) days of testimony were taken from outstanding authorities in the fields of civil engineering, epidemiology, traffic, geology, hydro-geology, microbiology, hydraulics and architecture. The collection of Ph.D.'s and full professors befit the novelty of the issues and the importance of the litigation to all parties in interest. Furthermore, the Court in the company of the deputy attorney general, the attorneys for the plaintiffs and intervening plaintiffs and the defendants, and two engineers, spent

two hours viewing the area, the access road, the roads, seeps, springs, and the subdivision itself.

Plaintiffs believe they are fighting for preservation of a way of life and for an ecology milestone. Defendant developers have committed one million dollars in land costs and expended $216,000 in addition, at least that at the time of the temporary hearing, for development. Payments on the land contracts are in the amount of $75,000 per annum.

The remaining challenges of the plaintiffs, as mentioned above, to the project might be summarized as follows:

First, Water Pollution: The size of the project and its proximity (eight hundred feet to a bluff and one-quarter mile from Lake Michigan) threaten to pollute springs and seeps along said bluff and Lake Michigan itself by the projected use of individual or on-site septic tank systems on such a large scale. Further, that projected individual wells unless installed at great depth will also be threatened by said density of on-site sewage disposal.

Secondly, Scenic Road: The size of the project with only one outlet, that on M-131, threatens the destruction of a section of scenic roadway running from Harbor Springs to Cross Village. The increased usage will require improvement which generally includes widening with removal of many unique trees presently along or on the right of way. Whether removed or not, the increased exhaust fumes would be detrimental to said trees.

Thirdly, Soil Erosion: That the grades in the project, and particularly in Plat No. 1, are so steep as to cause extensive bulldozing for site preparation with resultant increase in amount and rate of movement of surface water and soil erosion within the subdivision.

The statute provides that when the plaintiff has made a prima facie case the defendants may rebut the same. The statute goes on to state: "The defendant may also show by way of an affirmative defense that there is no feasible and prudent alternative to defendant's conduct." Section 3(1).

The defendant did not choose to plead or proffer evidence on the alternative. The issue then as interpreted by the Court is whether plaintiffs have established by a preponderance of the evidence that, reading from the statute: "the conduct of the defendant has or is likely to pollute, impair or destroy the air, water or other natural resources or the public trust therein." Section 3(1).

If so, the statute gives the Court certain alternatives. Reading from the statute: "The Court may grant temporary and permanent equitable relief, or may impose conditions on the defendant that are required to protect the air, water and other natural resources or the public trust therein from pollution, impairment or destruction." Section 4(1).

The Court makes the following findings of fact:

(1) That certain seeps and springs emerge at the foot of the bluff along Lower Shore Drive which come from surface and perched ground water from the lands of defendant developer, it being established that the flow of surface and perched water runs from the northeast to the southwest in the area of Plat No. 1.

(2) That these seeps and springs already contain pollutants in the nature of bacteria, phosphates and nitrates, and which are in increasing amount as one proceeds southeasterly along the bluff and closer to the present Birchwood Lodge and horse barns.

(3) That the water seepage is unusually fast in this area, probably upwards of three feet per day.

The figures of the geologist worked up to seven, but he reduced it because he could scarcely believe the speed. So that for some defect this seepage seems to be beyond that which normally exists.

(4) That normally fifty feet horizontal separation and six feet vertical separation is sufficient between septic systems and well-water lines.

(5) That all authorities agreed that it would be unsafe to permit use of the parched water, less than 100-feet wells, if septic tanks were to be used on the scale here anticipated, and the high porosity of the upper soils. There is some question as to whether that was fully understood at the time of the filing of the Department of Health, since the exhibit which is attached to the Baar deposition indicates that the wells might be as low as 100 feet, whereas now it would appear that the wells would have to be 125 to 300 feet.

The soil strata generally existing below the project consists first of a thick layer of sandy soil that is excellent for septic tank and tile field operation; below that a thick layer or lens of clay that is impervious to water and suspends or perches water on its surface; that below this lies a thick layer of sand, gravel, and discontinuous clay, which are referred to as the regional aquifer and bear the regional water table, reaching to bedrock. The latter is at about 650 feet mean sea level or approximately 300 feet below the average surface of the project, and compares with the 570 to 580 mean sea level for Lake Michigan itself. This regional water table merges with Lake Michigan eventually.

(6) That wells of 125 to 300 feet would be necessary to reach the regional water table and that no other individual well depths could be safe in the light of the density of the septic tanks contem-

plated, the porosity of the upper soils, the thickness of the clay lens running under the project.

(7) That the cost per site of a septic system would be from $800 to $1,600, depending upon the degree of the slope and the arrangement of the field tile in the particular lot and the necessity for staging.

(8) That the cost per site of a central system would be approximately $2,400 including the construction of the treatment facility, but not including the immediate cost of maintenance of the treatment facility.

(9) That the cost of on-site wells of the depth required to reach the regional water table would be $3,000 on the average, or in excess of the cost of a central water system per lot.

(10) That the market for these lots—that is, the golfing, riding, hiking, recreation, retirement market—is such that while sales will be substantially completed in five years, actually building on the lots will generally be upwards of ten years hence when the purchaser retires.

(11) That immediate installation of central facilities would not be economically feasible when "build-out" is ten to thirty years in the future.

Defendant developer's engineer, Mr. Williams of Williams and Works, testified that he would not recommend central sewage at this time, but that his opinion would change if it were forty percent or more built up.

Witness Baar of the Michigan Department of Public Health testified that it had been warranted to him that future projects would be required to have a central water supply.

(12) That the present M-131 is deficient from the viewpoint of "safety", "base" and "surface", which are tests of the Michigan Department of Public

Highways, and is acceptable only because of the low usage or capacity, which gives it a passing grade therein.

(13) That any substantial increase of volume would change this capacity rating and cause the road to be deficient in all areas of rating. That it has been established that the trips per day from the increased usage would be at least five and that the burden would at least be doubled by the project of developer on "build-out".

(14) That said roadway is a scenic roadway with unique trees, curves and views so as to constitute and cause it to have esthetic values.

(15) That trees per se are natural resources.

(16) That the volume of traffic generated by defendant developer if all channeled over M-131 will destroy the scenic quality directly and indirectly; directly by noise and exhaust fumes which injure trees; indirectly if and when widening occurs to correct the capacity deficiency. This is true whether or not the trees are within the roadway or outside of the roadway, since there is a public trust in each.

(17) That the bulldozing of the prevailing steep slopes in the project is likely to cause erosion and enhancement of the quantity and speed rate of surface water flow once vegetation cover has been removed.

The Court makes the following conclusions of law:

(1) That the Court finds the statute is constitutional when interpreted as it has been here by the Court as follows:

(a) That "likely" means a reasonably proximate cause or result bearing a reasonable relationship to the public health, safety and welfare. This is consistent with the interpretation found at 25

Words and Phrases, page 470. The word "likely" means probably or reasonably to be expected. And in Verhelle vs. State Banking Commission, 347 Michigan 612, the term "likelihood of success" means a probability of success. That is on page 619. I don't know about success or failure, but we have the likely or probable phase thereof.

(b) That the conditions that the Court may impose must likewise bear the relationships mentioned above.

(2) That the plaintiffs have established by a preponderance of the evidence that pollution of the water is likely to occur and will have an adverse impact within the meaning of the statute as a result of the defendant developer's project, and

(3) That plaintiffs have likewise established the impairment or destruction of a scenic roadway and the trees thereon on M-131 between Harbor Springs and the project.

(4) That plaintiffs have likewise established that erosion within the project is likely to be caused by the defendant developer's project with additional surface water consequences to the public health and safety and welfare.

The Court therefore under the statutory authority imposes the following conditions upon the project:

(1) That no more than forty percent of the lots in Plat No. 1 and no lots in as yet unplatted areas of the project should be built upon unless and until central water and sewer are provided, and that appropriate escrow deposits be established to ensure that funds will be available to begin these projects in accordance with the rate and the amount and on the procedures established by the temporary order of this Court.

(2) That an improved access road from Plat No. 1 be opened upon Middle Road as well as upon M-131 to divide the traffic burden.

(3) That appropriate sodding and other surface water dams, reservoirs and other devices be provided to restrain the flow of surface water within the subdivision.

These conditions are meant to be general in nature and may be implemented or altered by more specific proposals which may be substituted by the parties upon appropriate notice. In the absence thereof a judgment may be presented in accordance with the above.

Since both parties have prevailed in part no costs will be taxed, and it being a substantial public question.

The exhibits will be retained by the Court pending the appeal time, and then may be recovered by the parties upon the making of an appropriate receipt therefor.

T. G. KAVANAGH, C. J. *(concurring).* I concur with my Brother WILLIAMS that the matter should be remanded for findings of fact.

I do not sign his opinion however, in order to make clear the understanding that his generous effort is offered as a suggestion and not a limitation or inhibition on the fact finder.