[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
I. STATEMENT OF FACTS
This is an administrative appeal pursuant to Connecticut General Statutes Section 22a-43 from the decision of the defendant Conservation Commission/Inland Wetland Agency (hereinafter referred to as "Commission") of the Town of Salem. Included as defendants are the Town of Salem, the Salem Town Clerk, and the Conservation Commission/Inland Wetlands Agency of the Town of Salem. The named defendant, Greenscape of Salem, (hereinafter referred to as "Greenscape") is a Connecticut general partnership. Also included as defendants are George Warner, John Flowers and Jeffrey Flowers, partners in Greenscape.
On March 8, 1988, the defendant Greenscape filed Application No. 89-9-9 with the defendant Commission requesting permission to conduct regulated activities within a designated wetland on property owned by it in the Town of Salem. At or about the same time, the Greenscape filed a subdivision application with the Salem Planning and Zoning Commission which Commission is not a defendant in this action. On July 13, 1989 and July 27, 1989, the defendant Commission and the Planning and Zoning Commission opened, conducted and closed a joint public hearing on Application No. 89-4-4, and on the companion subdivision application. The defendant Commission rendered its decision on August 31, 1989, and notice of that decision was published in the Norwich Bulletin on September 15, 1989. On July 13, 1989, the plaintiff filed with the defendant Commission a "notice of intervention and request for postponement of the decision pending further study and notice of meetings." The plaintiff was afforded intervenor status pursuant to Section 22a-19 (a) of the Connecticut General Statutes.
II. THE DECISION IN ISSUE
On August 31, 1989, the Commission approved the application of Greenscape unanimously under the following motion: CT Page 3801
 M/S/C (Ziegra/Sipperly) to approve application #89-4-4 of Greenscape of Salem: A Partnership for a 33 lot subdivision known as Morgan Farms — Phase II as presented on plan revised 3/29/89 which was presented as Exhibit #2 at the Public Hearing held on 7/13/89 and plan revised 8/28/89 as per Rowley Engineering recommendations and including all fourteen (14) conditions and eleven (11) additions to the construction sequence. This plenary ruling is granted in accordance with Sec. 6 of the Town Salem Inland Wetlands and Watercourses Regulations and it is the opinion of the commission that every effort has been made to minimize potential impacts to on-site and off-site resources as evidenced by the many revisions and alternatives the Commission has examined. The Commission has taken into consideration all information submitted, including Exhibits #1 through #50 which were submitted at the Public Hearing and all testimony given at the Public Hearing. Vote: approved unanimously. (emphasis provided)
The fourteen conditions, eleven additions to the construction sequence, and Exhibits 1 through 50 are as follows.
FOURTEEN CONDITIONS
1. No underground fuel or chemical storage tanks of any type to prevent any possible pollution of aquifers and public water supply.
2. Limits of disturbance shall be required on the following lots due to potential construction impacts. These lots contain steep slopes which should be left as undisturbed as possible. The limits of disturbance shall be field located and delineated by staking or silt fence along the contour called for. This condition should greatly reduce any erosion and siltation and their subsequent impacts.
 Lot # 3-30 contour 260 Lot # 3-31 contour 270 Lot # 3-32 contour 248 Lot # 3-34 contour 270 Lot # 3-45 contour 240 Lot # 3-46 contour 240 CT Page 3802
3. Per the Sanitarian's report, the following lots shall have engineered systems due to ledge and mottling being present at different depths:
Lots # 3-32 through 35, 37, 38, 39, 41, 43, 51, 53, 56 and 42.
4. All system locations shall conform to the minimum seventy-five (75) foot setback requirement from all wetland lines per Sections 4.3 and 4.4 inclusive.
5. Except for roads, driveways, stormwater systems and utilities, no construction shall be allowed to take place within the wetland buffer areas designated on the plan of record.
6. All areas of designated Open Space, as well as the additional non encroachment areas, should be deeded as such. These areas should be left in their natural condition and delineated in the field with some type of marker.
7. Any lot containing wetlands where a regulated activity is proposed, other than what has been approved by this Commission, shall be subject to further review and permit. This includes all driveway crossings. No driveway permits are approved with this action.
8. The crossing of Harris Brook shall not be done until such time as the wetlands replication in the area of the gravel spoils substantially complete. All excavation shall be finished, side slopes rough graded, and all disturbed areas stabilized per the Soil Conservation Service's guidelines.
9. No chemical fertilizers or herbicides shall be applied adjacent to regulated areas.
10. The applicant must supply the Commission with the final construction sequence for the replication at stations 30.00 to 37.00 prior to commencing any construction activity in this area.
MORGAN FARMS — PHASE II
11. On sheet #19 of the plans, the driveway shown at station 22 must be deleted.
12. No paved leak-offs will be allowed.
13. The plans revised 8/28/89, as per the concerns of the Town Engineer and the Wetlands Enforcement Officer, shall be made a part of the plan of record and all conditions of approval shall be set on the approved plan. Any restrictions on certain parcels shall be contained in the deeds. CT Page 3803
14. A bond in an amount to be agreed upon by the Commission shall be required.
ELEVEN ADDITIONS TO THE CONSTRUCTION SEQUENCE
1. In advance of any work on this project, the applicant shall contact the Inland Wetlands Agency's representative and arrange for an on-site pre-construction meeting. This is to insure that all the Orders of Conditions are understood by all parties.
2. Prior to the start of construction, adequate erosion/sedimentation control measures shall be installed per the approved plans. They shall be maintained throughout the entire construction phase per the direction of the appropriate Enforcement Officer. No structures shall be removed until the area has become stabilized with a permanent vegetative cover and said Enforcement Officer has given written approval. The agency, or its agent, reserves the right to require additional measures should an unanticipated problem arise. Any additional measures requested shall be installed within forty-eight (48) hours of verbal and written notification to a designated on-site agent. Failure to do so shall result in an immediate stop/work order being issued which shall be effective until the additional measures are installed.
3. The Agency's representative shall be notified at least forty-eight (48) hours prior to the commencement of any construction. There shall be on person designated as an on-site agent for the applicant. This person shall be responsible for maintaining compliance with these Orders in the absence of the applicant.
4. A copy of this Order of Conditions shall be on-site at all times, along with a copy of the approved plan. The applicant shall be held responsible for the implementation and construction of this plan. Any deviation from same shall be identified to the Agency's representative immediately.
5. The erosion and sedimentation control structures shall serve as the limits of disturbance.
6. Construction staging and maintenance areas are to be designated on the plan and approved by the Agency's representative prior to construction. Under no circumstances shall these areas be adjacent to any regulated area. There are to be no underground storage tanks of any kind. All waste oils, fluids, solvents, etc. shall be stored in approved containers and disposed of off-site on a regular basis.
7. All work in waterways shall be done during periods of low flow. Any other work proposed in or adjacent to regulated areas shall be kept to a minimum. Visual barriers of some type shall be installed to keep machinery within the approved areas of disturbance.
8. The construction site shall be left in a stable condition at the end of CT Page 3804 each day.
9. All disturbed areas shall be stabilized with permanent vegatative cover. After proper grading, the area shall be loamed with a minimum of four (4) inches of top soil and seeded with appropriate cover and mulched with cover of at least two (2) inches. Hay, straw or bark may be used. No liquid or solid chemical fertilizers, pesticides, herbicides or chemical or petroleum dust control agents shall be applied on this site.
10. A maintenance schedule for the cleaning of all basins, catch basins, swales, etc. shall be supplied by the applicant. The minimum requirement should be twice a year, but the Agency reserves the right to ask for additional cleaning during construction as it deems necessary.
11. The Agency reserves the right to impose additional conditions on any or all portions of this work to minimize the potential impact of site erosion or degradation of water quality. These conditions and orders shall apply to all successors in interest or control of this property.
EXHIBITS 1 — 50
(1) Letter from Robert D. Tobin, Esq. to Salem Conservation Commission, re: mailing of notices per section 5.8 of Commission regulations, dated 7/13/89, with attachments. (11 pages) (A)
(2) "Morgan Farms of Salem Subdivision Phase II" maps (incorporating subsequent amendments resulting from municipal approvals/requirements). (38 sheets) (A)
(3) Eastern Connecticut Environmental Review Team Report "Greenscape Development Corporation Subdivision, Salem, Connecticut, May, 1989" (60 pages, including covers, title page, introduction and index) (A)
(4) "Traffic Impact Assessment, Proposed Residential Development, Salem, Connecticut" by Wilbur Smith Associates, January, 1989. (79 pages) (A)
(5) "Morgan Farms at Salem Connecticut" Phase I and II Technical Data (155 pages) (A)
(6) Wetlands replication map. (1 page) (A)
(7) "Notice of Intervention and Request for Postponement of the Decision Pending Further Study and Notice of Meetings" filed by Robert Fromer with the Conservation Commission, dated 7/13/89, with attachments from an earlier intervention request, incorporated at Mr. Fromer's request. (65 pages) CT Page 3805 (F)
(8) "Notice of Intervention and Request for Postponement of the Decision Pending Further Study and Notice of Meetings" filed by Robert Fromer with the Planning and Zoning Commission, dated 7/13/89. (13 pages) (F)
(9) Memorandum of Law, dated 7/13/89. (4 pages) (F)
(10) Request for Environmental Review Team Expert, dated 7/13/89. (1 page) (F)
(First Letter) Letter from Rowley Engineering Associates, P.C. to Planning and Zoning Commission, dated 7/7/89, with attachments. (9 pages) (PZC)
(Second Letter) Letter from Rowley Engineering Associates, P.C. to Planning and Zoning Commission, dated 7/13/89. (5 pages) (PZC)
(Third Letter) Letter from Peter W. Davis, Environmental 
Zoning Officer of the Town of Salem to Salem Conservation Commission, dated 6/8/89. (3 pages) (CC)
(Fourth Letter) Letter from Peter W. Davis, Wetlands Officer, to Salem Conservation Commission, dated 6/14/89. (3 pages) (CC)
(11) "Sample Order of Conditions for Phase II, Morgan Farms, Salem, Connecticut". (3 pages) (A)
(12) Letter from Azimuth Engineering Ltd. to Greenscape Development Corp., dated 7/26/89. (2 pages) (A)
(13) "Bedrock Geological Map of Connecticut", emphasis added, with attachments. (4 pages) (F)
(14) Request for Sufficient Time to Respond to Greenscape of Salem's Comments, dated 7/13/89. (1 page) (F)
(15) Resume of Robert Fromer (5 pages) (F)
(16) "A Study of the Chemical Reactivity to Water of Selected Connecticut Rock Strata" June, 1980. (34 pages) (F)
(17) Letter from Charles R. Frink to John Caltabiano, D.V.M., dated 7/25/89, with attachments. (3 pages) (F)
(18) "Bedrock Geology" excerpt from 5/30/89 ERT report. (1 page) (F) CT Page 3806
(19) Excerpts from EPA "Results of the Nationwide Urban Runoff Program". (27 pages) (F)
(20) Excerpts from "Journal Water Pollution Control Federation" November, 1988. (11 pages) (F)
(21) "Preserving Water Quality Without Sewers: A Case Study of On-Site Wastewater Disposal Hydrology". (11 pages) (F)
(22) "Gasoline Parameters". (1 page) (F)
(23) "Asbestos as an urban area pollutant". (9 pages) (F)
(24) Page 70 "Water Quality and Treatment". (1 page) (F)
(25) Excerpt from "Connecticut Environmental Review 1988". (2 pages) (F)
(26) Excerpts from "Wastewater Engineering". (8 pages) (F)
(27) Excerpts from "Industrial Water Pollution". (8 pages) (F)
(28) Excerpts from "Wastewater Engineering". (5 pages) (F)
(29) "Settleability of Urban Runoff Pollution". (23 pages) (F)
(30) "Material Safety Data Sheet". (2 pages) (F)
(31) "LESCO Material Safety Data Sheet, PRE-M 60 DG Herbicide". (2 pages) (F)
(32) "LESCO Material Safety Data Sheet, Threeway Selective Herbicide". (2 pages) (F)
(33) "Material Safety Data Sheet, Ethylene Glycol". (4 pages) (F)
(34) "Witco Material Safety Data Sheet" for four products: Amalie Dexran II ATF, Amalie HD-1 Motor Oil, Amalie Imperial 72 Motor Oil, and Amalie Pro High Performance Motor Oil. (8 pages) (F)
(35) "Studies on the mechanism of phosphorus removal from treated wastewater by sand". (6 pages) (F)
(36) "Bioconcentration and Elimination of Selected Water Pollutants by Bluegill Sunfish". (14 pages) (F)
(37) "A Formula for Assessing the Ecological Value of Trees". (5 CT Page 3807 pages) (F)
(38) Excerpts from "Dangerous Properties of Industrial Materials". (10 pages) (F)
(39) Excerpts from unidentified text. (43 pages) (F)
(40) Excerpts from "Chapter 17/Biological Suppression of Turf Insects". (2 sheets, double sided) (F)
(41) "Attack Pesticide Toxicity Chart". (2 pages) (F)
(42) Various Insecticide/Pesticide industry documents. (24 sheets, some double sided) (F)
(43) Copy of New London Day article" "State's open land can be perserved specialists says (sic)". (2 pages) (F)
(44) "Stormwater Runoff Quality and Its Management — Questions". (4 pages) (F)
(45) "Wildlife Questions". (3 pages) (F)
(46) "Environmental Assessment and Impact Analysis — Questions". (2 pages) (F)
(47) Excerpt from Tait and LaPlante's Handbook of Connecticut Evidence. (3 pages) (F)
(48) Set of 36 slides used in applicant's presentation. (Not returned herewith — to be made available at oral argument if requested by the Court.) (A)
(49) Large artist's rendering of site development plan used in applicant's presentation. (Not returned herewith — to be made available at oral argument if requested by the Court.) (A)
(50) Large artist's rendering of site master plan used in applicant's presentation. (Not returned herewith — to be made available at oral argument if requested by the Court.) (A)
III. THE REGULATED ACTIVITIES IN ISSUE
Application 89-9-9 concerns Phase II of the Morgan Farms of Salem residential subdivision, a six-phase development on a 650-acre piece of property. Phase II involves 33 single-family house lots, each 80,000 square feet. Greenscape filed with the Commission an application to conduct CT Page 3808 certain regulated activities for completion of Phase II, including three road crossings, two over the Eight Mile River and one over Harris Brook. Meeting House Lane crosses Eight Mile River at the north end of the proposed project. A second crossing of the Eight Mile River is near the intersection of Old Farm Road and Little Meadow Road at the west end of the project. Cross Brook Circle crosses Harris Brook near its intersection with Little Meadow Road. The first two crossings are part of a loop road connecting Phase I to Phase II, which is required to avoid an impermissibly long cul-de-sac. The crossing of Eight Mile River and Harris Brook also are required to access the applicant's site. The third is necessary to provide access to the southern end of Phase II where the housing is located. The loop road and the crossings largely follow the path of existing unimproved roads and crossings.
Greenscape also proposed to place limited amounts of fill in wetlands for road embankments required to meet town road width standards, and for various structures necessary to discharge drainage from the road system. In addition, Greenscape proposed to create a new 1.5 acre pond and wetlands area and a second wetlands replication area. In this area, Greenscape will create more wetlands than it impacts.
Greenscape proposed to fill or disturb 1.4 of the 39 acres of wetlands located on the portion of the site occupied by Phase II. At the same time, Greenscape will create one-half acre of new wetland areas and the 1.5 acre parcel.
Greenscape incorporated into its proposal a number of measures designed to avoid or mitigate impact upon wetlands. These include: retaining control over placement of houses on the lots to limit alteration of wooded areas, and maintaining a 100-foot buffer between houses and wetland areas near Harris Brook and locating septic systems 75 feet from the wetlands. Its proposal also incorporates substantial sedimentation and erosion control measures during construction. It further includes limitation on the use of fertilizers, herbicides and pesticides in or near regulated areas. In addition, Greenscape has incorporated structures designed to trap and remove pollutants from any water draining off the roads before it is discharged into the ground or the wetlands.
III. STATUS OF PLAINTIFF AS INTERVENOR
Plaintiff has the right as an intervening party pursuant to Section 22a-19 (a) to bring the instant appeal. His right as an intervening party, however, is limited to raising CT Page 3809 environmental issues. As was stated in Red Hill Coalition, Inc. v. Conservation Commission, 212 Conn. 710, at pages 714-715 (1989):
 "In Mystic Marinelife Aquarium, Inc. v. Gill, supra, we recognized that a party even if not `classically' aggrieved may still have statutory standing to appeal an agency's decision. Section 22a-19 (a) allows `any person, partnership, corporation, association, organization or other legal entity' to `intervene as a party' in any `administrative, licensing or other proceeding, and in any judicial review thereof' that `involves conduct which has, or is reasonably likely to have, the effect of unreasonably polluting, impairing or destroying the public trust in the air, water or other natural resources of the state.'
 General Statutes Section 22a-19 (a) is part of the Environmental Protection Act (EPA). General Statutes Section 22a-14 et seq. The purpose of the EPA is `to give private citizens a voice in ensuring that the air, water and other natural resources of the state remain protected, preserved and enhanced, and to provide them with `an adequate remedy to protect the air, water and other natural resources from unreasonable pollution, impairment or destruction' General Statutes Section 22a-15.' Connecticut Water Co. v. Beausoleil, 204 Conn. 38, 44, 526 A.2d 1329 (1987); see also Mystic Marinelife Aquarium, Inc. v. Gill, supra, 489; Belford v. New Haven, 170 Conn. 46, 53-54, 364 A.2d 194 (1975). By permitting intervention under Section 22a-19 (a), the EPA allows private persons to `intervene in an existing judicial review of an agency action or to initiate an independent declaratory or injunctive action.' Connecticut Water Co. v. Beausoleil, supra, 44-45. An intervening party under Section 22a-19 (a), however, may raise only environmental issues. Id., 45; Mystic Marinelife Aquarium, Inc. v. Gill, supra, 490". (emphasis provided) CT Page 3810
IV. BURDEN OF PROOF
The controlling case on the issue of burden of proof under The Environmental Protection Act is Manchester Environmental Coalition v. Stockton, 184 Conn. 51 (1981). In the Manchester case, the plaintiffs, alleging a violation of The Environmental Protection Act, sought to enjoin the unreasonable pollution, impairment or destruction of the air which would, they claimed, result from the automotive traffic generated by a proposed industrial park. In discussing the burden of proof under The Environmental Protection Act, the court in Manchester at pages 57-58 stated in part as follows:
 It is appropriate at this point to discuss the burden of proof under the EPA. Although the ultimate burden of proof never shifts from the plaintiff, the EPA contemplates a shifting of the burden of production. See Ray v. Mason County Drain Commissioner, 393 Mich. 294, 311, 224 N.W.2d 883 (1975). The plaintiff must first make "a prima facie showing that the conduct of the defendant, acting alone, or in combination with others, has, or is reasonably likely unreasonably to pollute, impair, or destroy the public trust in the air, water or other natural resources of the state. . . ." General Statutes Section 22a-17.
 Under Section 22a-17, the plaintiff must first come forward and show that the defendant has, or is reasonably likely to unreasonably pollute, impair, or destroy a natural resource. The legislative history shows that the word "unreasonably" was added as a means of preventing lawsuits directed solely for harassment purposes.
 Once a prima facie case is shown, the burden of production shifts to the defendant. Under section 22a-17, "the defendant may rebut the prima facie showing by the submission of evidence to the contrary." As stated in Ray v. Mason County Drain Commissioner, supra, 311-12, "(t)he nature of the evidence necessary to rebut plaintiff's showing will vary with the type of environmental pollution, CT Page 3811 impairment or destruction alleged and with the nature and amount of the evidence proffered by the plaintiff. In some cases, no doubt, testimony by expert witnesses may be sufficient to rebut plaintiff's prima facie showing. While in other actions the defendant may find it necessary to bring forward field studies, actual tests, and analyses which support his contention that the environment has not or will not be polluted, impaired or destroyed by his conduct. Such proofs become necessary when the impact upon the environment resulting from the defendant's conduct cannot be ascertained with any degree of reasonable certainty absent empirical studies or tests." (emphasis provided).
V. ISSUES RAISED BY PLAINTIFF
The plaintiff raises the following claims in appealing the decision of the defendant Commission.
 (a) There was an unlawful failure to consider the factors enunciated in Connecticut General Statutes Section 22a-41 and the Regulations, Sections 6.1 to 6.8 and to state the reasons for granting the permit pursuant to the Regulations, Sections 7.1 and 7.2;
 (b) There was an unlawful failure to grant the permit without first seriously considering and finding that feasible and prudent alternatives do not exist and to state the reasons on the Record pursuant to the Connecticut General Statutes Section 22a-19 (b) and the Regulations, Sections 6.2, 6.8 and 7.2;
 (c) There was an unlawful failure to demonstrate management, preservation, protection and conservation measures to mitigate against the loss of wildlife and wildlife habitat pursuant to the EPA and the Regulation, Sections 6.1.6, 6.1.8, 6.6, 6.7;
(d) There was an unlawful failure to CT Page 3812 consider adverse impacts to water quality, including the chemical properties of the water or soil, and aquatic life pursuant to the EPA and the Regulation, Sections 6.1.3, 6.1.4, 6.1.6 and 6.1.9.
 (e) There was an unlawful failure to provide a report to the PZC pursuant to the Regulations, Sections 5.14 and 7.1.
 (f) There was an unlawful violation of the Plaintiff's right to cross examination, direct and rebuttal testimony and evidence.
In addition to the preceding claims, the plaintiff makes the following additional claims in his brief
 (1) On subjects as technically sophisticated and complex as pollution, environmental and ecology, the Court is sufficiently without specific expertise to review the record of a inland wetlands agency and determine that the facts support the agency's findings and decision.
The Court finds that argument to be totally without merit. It is true that as an intervening party, the plaintiff has the right to raise environmental issues. However, the right to raise environmental issues does not include the right to pollute the record on appeal. Any further discussion of this claim would only serve to dignify it. This claim is therefore summarily dismissed.
 (2) The plaintiff further claims that the defendant Commission regulations are absent any provision concerning the membership of the agency and the transcripts fail to contain any cogent evidence or showing which grants authority for a member of one agency to conduct business for or on behalf of another independent, administrative body.
The Court is not persuaded by that argument.
A review of the transcript of the hearing clearly shows that the Planning and Zoning Commission did not conduct the hearing on behalf of the Commission. Further, the CT Page 3813 plaintiff as an intervening party only has the right to raise environmental issues and this claim was clearly not an environmental issue.
 (3) Plaintiff further argues that the the inland wetlands agency and the planning and zoning commission were without duly constituted authority to conduct a joint hearing.
The plaintiff cites Section 22a-20 in support of that argument. Section 22a-20 provides in part as follows:
 Sections 22a-14 to 22a-20, inclusive, shall be supplementary to existing administrative and regulatory procedures provided by law. . .Nothing herein shall prevent the maintenance of an action, as provided in said sections, to protect the rights recognized herein, where existing administrative and regulatory procedures are found by the court to be inadequate for the protection of the rights. (emphasis provided)
A complete review of the transcript of the joint hearing leads the Court to the conclusion that the procedures followed were totally adequate for the protection of the rights granted under Sections 22a-14 to 22a-20. To the extent that the applicant seeks to raise the claim that the two agencies did not have the authority to conduct a joint hearing, the Court finds that that claim does not raise any environmental issues in and of itself and is therefore not considered on its merits.
 (4) The plaintiff further argues that it provided pages of cross-examination questions on wildlife and storm water pollution, which the Commission failed to answer.
The Court is further not persuaded by that argument. The Commission was not required to answer the voluminous number of questions raised by the plaintiff in Exhibits 44, 45 and 46.
The plaintiff was repeatedly advised at the July 27, 1989 hearing that he had the right to ask questions of the applicant's witnesses, but that the administrative agencies would not answer his questions. Portions of the transcript of CT Page 3814 the public hearing of July 27, 1989 reveal the following:
 STEVENS: . . . Mr. Fromer that this is a public hearing, and if the public hearing continues, a copy of these questions will be made available to Greenscape. If for any reason the public hearing is closed this evening, you are not going to be getting answers back from us on these questions if this public hearing is closed.
 FROMER: That's fine, Mr. Chairman. Let me make you aware of something from a legal standpoint of your actions, although it may be just to caution you about taking any precipitive action along that route, okay? I have a right to put in questions and have a right to be treated the same way as the applicant. Now the applicant has addressed the issues here for two nights for an extended number of hours, probably on the border of six or seven hours, okay? There is no pressing need at this point in time to close the hearing in terms of making a decision. You have time limits that can be met. I'm putting in these questions into the record, number one, it's late; it is approximately 11:00 o'clock at night.
 STEVENS: It's not late for us, we go to 1:00.
 FROMER: Fine. It's 11:00 at night, and I am not going to sit here and try to ask any of these questions, and I would like to have him have the opportunity to peruse them and review them. You can do whatever you think is right. I'm going to put it into the record.
 STEVENS: You may put them into the record, but I am not going to act in the capacity of your agent to ask these questions to the applicant.
FROMER: I don't expect you to.
STEVENS: If you want these questions CT Page 3815 asked, we are here now. We'll continue so you may ask them.
 FROMER: I am not going to ask them. . . . I'm just going to put them into the record, Mr. Chairman.
. . .
 UNKNOWN: . . .I'd like to make a statement for the record. I indicated last time, Mr. Chairman, Mr. Fromer asked several questions which our experts answered. I have all of our experts, and have indicated I would bring them back tonight for examining by Mr. Fromer which has been made a party to these proceedings. I think we have proceeded in the normal course of business. If Mr. Fromer questions our experts, he should ask them and not give us a written list of questions. I know of no such procedure being. . . If he has questions, we are here to answer them.
STEVENS: Mr. Butts?
 BUTTS: It is in your discretion to either accept or reject that document. . .what happens is the hearing. . .that document then becomes the paper that contains questions that never were answered. It's not testimony in and of itself. It may be irrelevant. . .
 STEVENS: Mr. Fromer, I now have receipt of your list of questions. I caution you that you now at this time have the opportunity to, should you desire, ask these questions of the applicant and the experts are here in force this evening to answer questions at the public hearing. If, in the event, I want you to know I am not accepting these questions, I am not telling you that I am going to get back to answer them as questions or that the public hearing is being continued. If you want to submit them under that basis, you are perfectly welcome. We'll accept them. CT Page 3816
. . .
 FROMER: I will put those minutes, I will submit those questions into the record and hope that the commission will give the applicant an opportunity to look at the questions. I would be glad to make a copy of the questions available to the applicant so that he can look at them also, and either orally respond or put in a written response.
 STEVENS: Now, just to clarify what you just said, you're hoping you'll get a, we will give the applicant. . .we are giving the applicant now, and the applicant is willing and ready to answer the questions. If we are not ready here at this session to hear the answers, then that's your problem. We are extending the opportunity for you to get answers to these questions at this point in time while the public hearing is being held. Now do you want answers on those questions? Or, do you want to submit it as you have done?
. . .
 STEVENS: That's what's on the board? And again, I repeat, Mr. Fromer, that we are now in receipt of three documents, 44, 45 and 46 that are a list of several questions that you are requesting that we ask the applicant to answer. The applicant is standing up here. You want to ask those questions? . . .Can I have those questions? I cannot. . .if this commission continues, those questions will be given to the applicant and they can be answered.
. . .
 TOBIN: I just want the record to reflect that we are ready, willing and able to answer any questions that Mr. Fromer wants to pose to us at this time.
The Court finds that the plaintiff's claim regarding this issue is totally without merit. CT Page 3817
 (5) Plaintiff further alleges that the Commission in relying upon its own knowledge and experience, acted in a manner which placed its data base beyond the plaintiff's scrutiny.
The Court is also not persuaded by that argument. The facts of this case do not show any basis upon which the plaintiff can claim that the Commission relied upon its own knowledge and experience. Therefore, the plaintiff's reliance on Feinson v. Conservation Commission, 180 Conn. 421 (1980), is misplaced.
 A. THE PLAINTIFF'S CLAIM THAT THERE WAS AN UNLAWFUL FAILURE TO CONSIDER THE FACTORS ENUNCIATED IN CONNECTICUT GENERAL STATUTES 42a-41 AND THE REGULATIONS, SECTION 6.1 TO 6.8 AND TO STATE THE REASONS FOR GRANTING THE PERMIT PURSUANT TO THE REGULATIONS, SECTION 7.1 AND 7.2
In support of that argument, the plaintiff states in part as follows:
 The Commission merely stated that it had taken into consideration all the information and testimony presented at the public hearing which is not a mandated element of a decision. It is insufficient and inadequate to merely state that an agency considers specific evidence at a hearing.
The Court is not persuaded by that argument.
In discussing the requirement that a commission state upon the record the reasons for its decision as found in General Statutes Section 22a-42a(d), the court in Manor Development Corporation v. Conservation Commission, 180 Conn. 692,698 (1980), stated in part as follows:
 The requirement is met by the Commission's statement of the factors upon which it relied. Of course, those factors must be relevant to withstand a claim that the Commission acted arbitrarily.
In this case, the Commission found that every effort has been made to minimize potential impacts to on-site and off-site resources as evidence by the many revisions and alternatives the Commission has examined. The Commission CT Page 3818 further stated that it had taken into consideration all information submitted, including Exhibits #1 through #50, which was submitted at the public hearing and all testimony given at the public hearing. The exhibits, information and testimony relied on by the Commission were all relevant factors as reasons for granting the permit.
This Court concludes that the Commission has adequately stated the reasons for granting the permit.
The claim of the plaintiff that the Commission did not state the reasons for its decision raises a legal issue that was addressed in Gagnon v. Inland Wetlands and Watercourses Commission, 213 Conn. 604, 611 (1990), where the court stated in part as follows:
 (I)n an appeal from a decision of an inland wetlands commission, a trial Court must search the record of the hearings before that commission to determine if there is an adequate basis for its decision. First, the planning and zoning cases described above furnish a very compelling analogy for the application of the same rule to cases involving the Inland Wetlands and Watercourses Act. Second, the use of language concerning the inland wetlands agency's duty to state the reason for its decision on the record that is either identical to or very similar to language we have cited concerning other land use agencies lends great weight to the view that a similar rule should apply to an inland wetlands agency. The most cogent argument, however, is the public policy argument that a local land use body is composed of laymen whose procedural expertise may not always comply with the multitudinous statutory mandates under which they operate. The case law requiring the trial court on appeal to search the record for the agency's reason for its decision is a practical and fair reaction to this scenario. We conclude that the court erred in sustaining the plaintiff's appeal because the inland wetlands commission did not state on the record the reasons for its decision.
While this Court believes that the Commission has CT Page 3819 adequately stated the reasons for its decision, nevertheless this Court has searched the record for the Commission's reasons for its decision. A search of the record reveals the following:
The Commission received testimony from Raymond Levesque, a certified environmental professional, regarding the natural resources onsite and the potential impact on them. This included testimony concerning: the soil types on site; the different wetland habitats on site and their value; wildlife habitats on site; the wetlands replication and creation of the new pond; limitations imposed on the use of fertilizer, pesticides and herbicides; suggested limitations on the Town's use of salt on the roads during the winter; the techniques employed to renovate stormwaters before they are discharged into wetlands and watercourses; the proposals to impact on the quality of the water in Eight Mile River and Harris Brook; the creation of ecotones and edge effect through selective cutting of trees in the course of the development, and the diversification of vegetation and wildlife species it produces; the project's minimal impact upon wildlife, wildlife habitat and fisheries resources; the limited extent to which the proposal will change the physical, chemical or biological characteristics of the area; and the minimal impact upon the wetlands of pollutants emitted by auto traffic. The Commission further received testimony from a traffic expert and received input from technical staff, including the Town Engineer, the Zoning Enforcement and Wetlands Officer and a representative of Southeastern Connecticut Regional Planning Authority (SCRPA).
The Commission also reviewed a 60-page report prepared by the Eastern Connecticut Environmental Review Team. These individuals inspected the site and prepared a report which addresses the following subjects: topography, geology, hydrology, soils, wetlands and wetland impacts, flood hazard areas, sewage disposal, water supply, vegetation, wildlife and fisheries resources and impacts thereon.
At the public hearing, the Commission also received substantial testimony concerning alternatives to the proposed regulated activity, which addressed access, the location of crossings of the river and brook and the design of the structures required to cross them, alternative locations and designs and the factors which led to their rejection, the layout and design of the lots, the potential reuse of stormwater, the use of fertilizers, herbicides and pesticides, and impact upon existing trees.
The Commission was entitled to find the following CT Page 3820 reasons for its decision to approve this application.
 (1) The development is designed to use upland non-wetland areas as much as possible, and to protect and enhance as much of the natural vegetation as possible, including the valuable habitat corridors along the Eight Mile River and Harris Brook.
 (2) Construction of the bridge over Harris Brook will have no lasting impact on wetlands. The brook will remain the same after construction as it was before.
 (3) Although building the crossings over Eight Mile River where existing crossings are located is more difficult, that approach is the least damaging way to provide required access over the river.
 (4) Constructing the crossings over Eight Mile River by placing box culverts is necessary, because an arch bridge would not provide enough vertical clearance to allow a 100-year flood to pass under the structure.
 (5) There will be no impact upon the quality of the water contained in the river, brook or wetland.
 (6) The septic systems will cause no impact on wetlands or the environment.
 (7) There will be no impact on the streams, wetlands or brooks resulting from the discharge from the road drainage system.
 (8) The erosion and sedimentation controls will avoid adverse impacts on the wetlands during construction.
 (9) There will be only minor changes to the physical, chemical and biological characteristics of the area.
 (10) There will be no impact upon fisheries or wildlife resources. CT Page 3821
 (11) There will be minimal impact from emissions from automobile traffic in the area.
 B. THE PLAINTIFF'S CLAIM THAT THERE WAS AN UNLAWFUL FAILURE TO GRANT THE PERMIT WITHOUT FIRST SERIOUSLY CONSIDERING AND FINDING THAT FEASIBLE AND PRUDENT ALTERNATIVES DO NOT EXIST AND TO STATE THE REASONS ON THE RECORD PURSUANT TO CONNECTICUT GENERAL STATUTES SECTION 22a-19 (b) AND THE REGULATIONS, SECTION 6.2, 6.8 and 7.2
In support of that claim, the plaintiff argues in part as follows:
 The plaintiff also provided numerous feasible and reasonable alternatives in his verified pleading to mitigate the pollution, impairment and destruction. . . . The IWA failed to seriously consider, analyze, forecast and compare the environmental/ecological impact of the alternatives and determine in its findings the most "feasible and prudent" of them, the alternative with the least impact that is also prudent.
The Court is not persuaded by that argument.
The Court finds that as a result of the many revisions and alternatives submitted to the Commission by the applicant, as well as alternatives submitted to the Commission by the plaintiff himself, that there were adequate alternatives to the proposal to enable the Commission to consider alternatives to the proposed regulated activities as it was required to do.
In discussing the requirement of the Commission considering alternatives, the court, in Red Hill Coalition, Inc. v. Conservation Commission, 212 Conn. 710, 726 (1989), stated in part as follows:
 Finally, the plaintiffs contend that "the trial court erred by finding that the applicant(s) submitted alternatives to its proposed subdivision plan to enable the commission to consider alternatives to the proposed regulated activities as it is required to do." CT Page 3822
 The short answer to this claim of the plaintiffs is that, although the applicable statutes and regulations mandate that the commission consider alternatives to the applicants' proposed action, nowhere is it mandated that the alternatives emanate from the applicants. We conclude, as did the trial court in its memorandum of decision, that "(t)he record is replete with alternatives proposed for consideration by the commission whether submitted by the applicants with their reasons why such alternatives were not feasible or by interested parties." Neither the General Statutes nor the local regulations compel the applicants, sua sponte, to submit formal plans or drawings for all possible alternatives. Absent such a direction by the legislature, we will not read such a requirement into the wetlands act.
To the extent that the plaintiff argues that the Commission did not adopt his specific alternatives and mandate that those alternatives be followed by the applicant, the short answer to that claim is that the Commission does not have to do so.
 C. THE PLAINTIFF'S CLAIM THAT THERE WAS AN UNLAWFUL FAILURE TO DEMONSTRATE MANAGEMENT, PRESERVATION, PROTECTION AND CONSERVATION MEASURES TO MITIGATE AGAINST THE LOSS OF WILDLIFE AND WILDLIFE HABITAT PURSUANT TO THE EPA AND THE REGULATIONS, SECTIONS 6.1.6, 6.1.8, 6.6, 6.7
In support of that claim, the plaintiff argues in part as follows:
 Where there is a natural balance between wildlife (fauna) inhabiting the edge and those inhabiting the interior of a forested area, a minor increase in edge can have significant adverse impacts on the ecological equilibrium.
 The plaintiff introduced numerous scientific papers demonstrating the effects on bird populations; this, also, the agency failed to consider as evidence CT Page 3823 from the record. The remedy to this concern is to reduce the peripheral length of openings created by the clear cutting of flora; clustering of units reduces the edge and thereby the adverse impacts. However, neither the applicant nor the agency engaged in any analysis of a quantifiable nature to assess and evaluate the baseline faunal and floral conditions. Collection of empirical information by the "Scientific Method" results in the establishment of baseline data for the site and region to quantitatively determine and mitigate the impacts from haphazard growth. Anything less defeats and eviscerates the clear statutory intent of the Inland Wetlands and Watercourses Act and the Environmental Protection Act (C.G.S. Secs. 22a-1 and 22a-15).
The Court is not persuaded by that argument.
The plaintiff essentially argues that unless the Commission follows his "Scientific Method" and accepts the "numerous scientific papers" submitted by him, that the Commission has therefore failed to consider evidence from the record.
The short answer to this claim is that the Commission does not have to accept as credible any of the evidence submitted by the plaintiff and does not have to limit its decision to the "Scientific Method" advanced by the plaintiff.
The Commission considered all of the exhibits submitted to it, as well as all of the testimony at the public hearing and found that every effort had been made to minimize potential impacts to on-site and off-site resources. This finding is amply sustained by the record.
 D. THE PLAINTIFF'S CLAIM THAT THERE WAS AN UNLAWFUL FAILURE TO CONSIDER ADVERSE IMPACTS TO WATER QUALITY, INCLUDING THE CHEMICAL PROPERTIES OF THE WATER OR SOIL, AND AQUATIC LIFE PURSUANT TO THE EPA AND THE REGULATIONS SECTIONS 6.1.3, 6.1.4, 6.1.6 AND 6.1.9
In support of that argument, the plaintiff states in part as follows: CT Page 3824
 In reviewing the record, neither the town's nor the defendant-GoS's experts provided any analysis or calculations using models, algorithms or calculations to determine the species and quantity of pollutants anticipated in any discharges . . . nor, do any of the 14 conditions of the permit . . . require such analytical determinations of pollution and the attendant environmental/ecological impacts. Without such analysis and assessments, the agency must rely strictly upon narrative to evaluate the impact on existing water quality and alternatives to mitigate the effects. Since the defendant-IWA have failed to demonstrate a serious consideration of the impacts, alternatives and mitigative measures, other than a mere statement of such, the decision should be reversed or returned to the agency for further study consideration.
The Court is not persuaded by that argument.
As stated earlier, the Commission did find that in its opinion that every effort has been made to minimize potential impacts to on-site and off-site resources as evidenced by the many revisions and alternatives the Commission has examined.
Notwithstanding this statement, the plaintiff argues that analysis or calculations using models, algorithms or calculations to determine the species and quantity of pollutants anticipated in any discharges is the only proper procedure for a commission to follow since it is the procedure that he advocates.
The short answer to that argument is that the Commission is not required to use an analysis or calculations that satisfies the plaintiff. The Commission had before it abundant evidence to base its conclusion that every effort had been made to minimize potential adverse impacts. That evidence was based in part on testimony and exhibits submitted by Greenscape as well as testimony and exhibits submitted by the plaintiff himself. The record is replete with alternatives proposed for consideration by Greenscape, by the applicant, by the Commission's experts and by the Environmental Review Team.
E. THE PLAINTIFF'S CLAIM THAT THERE WAS AN UNLAWFUL CT Page 3825 FAILURE TO PROVIDE A REPORT TO THE PZC PURSUANT TO THE REGULATIONS, SECTIONS 5.1.4 AND 7.1
The short answer to this claim is that it is not an environmental issue and therefore cannot be raised by the plaintiff.
 F. THE PLAINTIFF'S CLAIM THAT THERE WAS AN UNLAWFUL VIOLATION OF THE PLAINTIFF'S RIGHT TO CROSS EXAMINATION, DIRECT AND REBUTTAL TESTIMONY AND EVIDENCE
In support of his claim, the plaintiff argues that the Planning and Zoning Commission and the Inland Wetlands Agency acted arbitrarily, capriciously and abused their discretion by requiring the plaintiff to direct his cross-examination through both agencies. The plaintiff further argues that there is no evidence in the minutes of the meetings or the transcript that the agency ever seriously considered the plaintiff's evidence and cross-examination questions and further argues that all indications in the transcript are that the commission of lay members consider the questions and evidence worthless and further argues that a review of the plaintiff's evidence by impartial experts, who were not employed or influenced by the defendants, would clearly contravene their opinions.
In further support of this claim, the plaintiff argues as follows in his April 16, 1990 brief:
 For a commission to forcibly limit a party to commence direct examination until after everyone else in the public, including the First Selectman, Mr. Teel, have spoken is unquestionably a subversion of procedural due-process. The issue is not whether at some remote instance of time the Defendant-IWA granted the Plaintiff an opportunity to speak, but, rather, as an intervening a (sic) party was he afforded the same equitable opportunities, courtesies and treatment as the applicant "to test the testimony." The record indicates that Attorney Tobin and Mr. Stevens acted in an apparent orchestral manner to stifle the cross-examination.
The plaintiff further argues in his February 11, 1991 reply brief in part as follows: CT Page 3826
 The agencies afforded the Plaintiff limited opportunities to present evidentiary material and cross examination. Members of the agencies and Attorney Tobin, representing the applicant, harassed, goaded and attempted to intimidate the Plaintiff and otherwise engaged in malicious conduct during the hearings.
The Court is not persuaded by that argument.
The Court has reviewed the complete transcript in this case. The Court finds that the attack by the plaintiff upon counsel for the applicant and upon the members of the agencies that held the public hearings is totally unfounded. The right to raise environmental issues does not include the right to attack agency members or counsel.
In discussing the nature of hearings before administrative agencies, the court in Huck v. Inland Wetlands Watercourses Agency, 203 Conn. 526, 536-537 (1987), stated in part as follows:
 Hearings before administrative agencies, such as this agency, although informal and conducted without regard to the strict rules of evidence, "must be conducted so as not to violate the fundamental rules of natural justice." Connecticut Fund for the Environment, Inc. v. Stamford, 192 Conn. 247, 249, 470 A.2d 1214 (1984); see Pizzola v. Planning 
Zoning Commission, 167 Conn. 202, 207, 355 A.2d 21 (1974). "Due process of law requires not only that there be due notice of the hearing but that at the hearing the parties involved have a right to produce relevant evidence, and an opportunity to know the facts on which the agency is asked to act, to cross-examine witnesses and to offer rebuttal evidence." Connecticut Fund for the Environment, Inc. v. Stamford, supra; see Welch v. Zoning Board of Appeals, 158 Conn. 208, 212-13, 257 A.2d 795 (1969). What we said in Obeda v. Board of Selectmen, 180 Conn. 521, 523-24, 429 A.2d 956 (1980), bears repeating: "While it is true that neutrality and impartiality of members of CT Page 3827 administrative boards and commissions are essential to the fair and proper operation of these authorities. . .a charge of bias must be supported by some evidence proving probability of bias before an official can be faulted. . . ." Because public officers, acting in their official capacities, are presumed, until the contrary appears, to have acted legally and properly; Brookfield v. Candlewood Shores Estates, Inc., 201 Conn. 1, 7, 513 A.2d 1218
(1986); Balch Pontiac-Buick, Inc. v. Commissioner of Motor Vehicles, 165 Conn. 559, 568, 345 A.2d 520 (1973); Hills v. Zoning Commission, 139 Conn. 603, 608, 96 A.2d 212 (1953); the burden on such a claim rests upon the person asserting it. See, e.g., Obeda v. Board of Selectmen, supra; Whittaker v. Zoning Board of Appeals, 179 Conn. 650, 654, 427 A.2d 1346
(1980).
A review of the transcript clearly shows that at the public hearing held on July 27, 1989, the plaintiff was repeatedly advised of his right to cross-examine any and all of the expert witnesses of Greenscape. The transcript further shows that there was extensive cross-examination conducted by the plaintiff without requiring the plaintiff to direct his cross-examination through either the Planning and Zoning Commission or through the Inland Wetlands Agency. The public hearing was conducted in a manner so as not to violate the fundamental rules of natural justice. The plaintiff was given the right to produce relevant evidence and an opportunity to know the facts upon which the agency is asked to act and to cross-examine witnesses and to offer rebuttal evidence. The hearing was conducted before two impartial and unbiased agencies.
CONCLUSIONS
(1) The plaintiff has not made a prima facie showing that the conduct of Greenscape, acting alone or in combination with others, has or is reasonably likely unreasonably to pollute, impair or destroy the public trust in the air, water or other natural resources of the state.
(2) Greenscape has met its burden of proving that its conduct is not reasonably likely unreasonably to pollute, impair, or destroy the public trust in the air, water or other natural resources of the state. CT Page 3828
(3) The Commission properly considered all of the statutory and regulatory factors in reaching its decision.
(4) The Commission considered alternatives to Greenscape's proposed activity.
(5) There were adequate measures to mitigate against the loss of wildlife and wildlife habitat.
(6) The Commission considered adverse impacts to water quality.
(7) There was no unlawful violation of the plaintiff's right of cross-examination, direct and rebuttal testimony and evidence.
(8) Every effort has been made by Greenscape to minimize potential impacts to on-site and off-site resources.
(9) The procedures followed in holding joint public hearings were adequate to protect all of the rights of the plaintiff.
(10) There is no evidence that the Commission relied on its own knowledge or experiences in rendering its decision.
ORDER
The appeal is dismissed.
AXELROD, J.