**PURE WATERS, INC., a not-for-profit corporation, Plaintiff,**

**v.**

**MICHIGAN DEPARTMENT OF NATURAL RESOURCES, Roland Harms, Director; Oakland County Drain Commission, George W. Kuhn, Commissioner; Chapter 20 Combined Sewer Overflow Drain Board, George W. Kuhn, Chairman; and City of Birmingham, Thomas M. Markus, City Manager, Defendants.**

No. 94–CV–74869.

United States District Court, E.D. Michigan, Southern Division.

Dec. 23, 1994.

Jean Ligon, Ligon & Naber, Brighton, MI, David S. Bailey, Beaverdam, VA, for plaintiff.

John Scherbarth, Asst. Atty. Gen., Lansing, MI, for defendant MDNR.

Timothy J. Currier, P. Daniel Christ, Beier Howlett, P.C., Bloomfield Hills, MI, for defendant City of Birmingham.

Miller, Canfield, Paddock & Stone, Detroit, MI, for defendant Oakland County Drain Com'n and Chapter 20 Birmingham CSO Drain Board.

## CORRECTED OPINION AND ORDER DENYING TEMPORARY RESTRAINT AND CERTIFICATION

FEIKENS, District Judge.

The Rouge River in southeastern Michigan has been a conduit of polluted waters for many years.

In my order, dated December 19, 1994, I referred to Civil Action No. 87–70992. That case, through consolidation, is an important instrument through which corrective measures are being taken to cure problems in that area which are similar to the pollution problems in this case.

What triggered the lawsuit which in turn led to this case, Civil Action No. 94–74869, is not a consent judgment but a settlement agreement. It is necessary for me to issue this corrective opinion which does not affect the substance of my opinion and order of December 19, 1994, but does give an accurate statement of the factors that are a background to this opinion.

On October 19, 1989, the Michigan Water Resources Commission issued NPDES permits to the communities in the River Rouge watershed. The City of Birmingham, a principal defendant, is one of these permittees. The permits applied to combined sewer overflow discharges. All River Rouge combined sewer overflow program requirements were developed to reflect the goals of the Rouge River remedial action plan ("Rouge R.A.P."), that goal being the elimination of raw sewage discharges and protection of the public health by the year 2005.

These permits established three Phases for C.S.O. control. The first phase was to operate, repair and maintain the existing facilities to minimize the discharge or raw sewage while planning was concluded for adequate control. Phase two required that C.S.O.'s be controlled to eliminate the discharge of raw sewage, and protect the public health by the year 2005. Phase three required that additional controls be applied, if necessary, to comply with water quality standards at times of discharge.

Thereafter, Detroit, Wayne and Oakland counties filed a petition before me, requesting that I take jurisdiction over these permit questions. I ruled that I had pendent jurisdiction over the "time and manner in which the parties deal with wet weather flows governed by permit standards." I appointed Dr. Jonathan Bulkley of the University of Michigan as court monitor, to attempt to negotiate a settlement of these issues. While administrative hearings proceeded before the Water Resources Commission, Dr. Bulkley involved the contesting parties and the State regulatory agencies in negotiations, which resulted in a settlement agreement dated June 28, 1991. The document was informally called the "Bulkley Settlement."

In accordance with this settlement, the permits issued on October 19, 1989 were revised, and on August 20, 1992, these revised permits were re-issued. It is in accordance with these revised permits issued to the City of Birmingham, that this issue has returned to me.

In many of the communities of the watershed there are combined sewers, i.e., those that carry both storm water and wastewater. In order to avoid basement flooding and toilet back-ups, the communities are permitted to discharge excess wet weather overflows into the Rouge River. This discharge contains storm water, snow melt run-off and wastewater. The settlement agreement and the revised NPDES permits seek to secure compliance with federal clean water and pollution laws and to rectify such wet weather pollution problems arising in the watershed.

Birmingham, a party in the settlement agreement, is in the process of constructing large retention basins in its domain, one of which is the Linden Park Retention Basin. It is that proposed construction that brings about the filing of the complaint in this action.

Pure Waters, Inc. is a not-for-profit membership organization composed primarily of

citizens living in and around the City of Birmingham, Michigan. Members of Pure Waters, Inc. include citizens who live adjacent to Linden Park, who complain that defendants' Environmental Assessment and Finding Of No Significant Impact fail to meet the requirements of the National Environmental Policy Act (NEPA), 42 U.S.C. § 4331 *et seq.*, and the Michigan Environmental Protection Act (MEPA), Michigan Compiled Laws §§ 691.1201 *et seq.;* also that it fails to comply with applicable state and federal water quality standards under the Clean Water Act, *33 U.S.C.* § 1251 *et seq.*, and defendants' NPDES permit.

Plaintiff specifically alleges that defendants refuse to evaluate water quality compliance for discharge of partially treated combined storm and waste water, fail to assure compliance with the Michigan water quality standards, fail to observe chlorine standards, violate NEPA in refusing to assess groundwater problems at the Linden Park site, and refuse to fairly evaluate a sewer separation alternative.

Having filed that complaint, plaintiff then moved on December 14, 1994 for a temporary restraining order to halt the construction of the basin. At a hearing conducted on December 15, 1994, I studied the Oakland County Combined Sewer Abatement Program, which contains the Birmingham combined sewer overflow area project plan. That study is voluminous and is summarized in Section I, a copy of which is attached hereto and incorporated herein.

One of the related documents, which was reviewed at the hearing, is the Finding Of No Significant Impact, dated June 1, 1994. This document fully discusses the retention basin project in the City of Birmingham, including the Linden Park project. I quote from the document at page 23:

### VII. PUBLIC PARTICIPATION

Public participation was the key issue in the evaluation of alternatives and was a critical element in the selection of the proposed project. Numerous newspaper articles have featured the project, along with the other CSO control projects in this area. Newsletters were mailed out and public meetings were held to discuss and inform residents of the project. The public hearing was held on March 29, 1993, at the Birmingham City Commission Room. A presentation was made of the project plan, including the alternatives considered, the environmental impacts anticipated, and the estimated costs. Significant opposition was voiced at this hearing, including concerns over the disruption of Linden Park, loss of property values, destruction of trees along the routes of the collecting sewers, and future requirements for CSO control. In an effort to optimize social acceptability and project implementability, the Citizen's Advisory Committee, referenced earlier, was established. Following the additional evaluation, described previously, and solicitation of public input, using the committee as a forum to resolve concerns, a resolution was passed by the city commission approving and agreeing to implement the modified Linden Park alternative.

### VIII. AGENCIES CONSULTED IN PLAN PREPARATION

Michigan Department of State—History Division

Michigan Department of Natural Resources

—Land and Water Management Division

—Surface Water Quality Division

—Wildlife Division

—Air Quality Division

Southeast Michigan Council of Governments

### IX. REASONS FOR CONCLUDING NO SIGNIFICANT IMPACTS

The water quality benefits anticipated from this project are expected to outweigh the short-term adverse construction impacts. No long-term significant adverse impacts are associated with the project.

At the hearing on the motion for a temporary restraining order, it became evident to me that plaintiff's objections were not substantial. It appeared that plaintiff's aim is to prevent the building of the retention basin and to substitute therefor a system of separated sewers throughout the city. Defendants considered this alternative and, I am

convinced, rejected it for appropriate reasons. A comparison of the costs of the retention basin and the separated sewers is illuminating. The retention basin and interceptor project is estimated to cost $29,861,000, and the separated sewer project, substantially in excess of that, is estimated to be $64,498,000.[1] *See* Birmingham CSO Area Project Plan at Section III–8.

Plaintiff also argued at the hearing that construction of the retention basin would make pollution in the river worse. Their concerns about the discharge of water quality into the Rouge River are without foundation. The river presently is highly polluted, and the discharge under controlled conditions from the retention basin, after treatment of excess water overflow under wet weather conditions, will certainly not add to the pollution of the river. It will substantially decrease it because the content of the retention basin (over 85%) will not be discharged into the river.

In order to prevail, plaintiff must show irreparable harm; that its interests are such that there is a likelihood of success on the merits; also, that there is no injury to the public interest. *Washington v. Reno*, 35 F.3d 1093, 1099 (6th Cir.1994).

Plaintiff fails to satisfy these requirements. The project, as demonstrated, is well underway. To stop its construction now would cause irreparable harm to defendants and to the public interest. Such action is not warranted in view of the compliance by defendants with the requirements of the federal and state Acts. NEPA, 42 U.S.C. § 4331 *et seq.*; MEPA, M.C.L. §§ 691.1201 *et seq.*; Clean Water Act, 33 U.S.C. § 1251 *et seq.*

At the hearing, at which I denied the request for a temporary restraining order, I offered plaintiff an opportunity for a further hearing on its conjoined motion for a preliminary injunction. This, plaintiff declined. Instead it requested that I certify my denial of its motion for a restraining order to the U.S. Court of Appeals for the Sixth Circuit. This, I decline to do since there is little or no merit in plaintiff's request.

If plaintiff still desires to renew its motion for a preliminary injunction, I will hear it. But I deny plaintiff's motion for a stay of this order denying temporary restraint.

Accordingly, plaintiff's motion for a temporary restraining order and for denial of certification is rejected. I also deny plaintiff's motion for a stay of this order denying temporary restraint.

1. The annual equivalent cost is $3,085,000 and $6,391,000, respectively.

## OAKLAND COUNTY CSO ABATEMENT PROGRAM
# BIRMINGHAM  CSO  AREA
# PROJECT PLAN
## FOR
## COMBINED  SEWER  OVERFLOW  CONTROL
### NPDES  PERMIT  NO.  MI  0025534

PREPARED  BY
# HUBBELL, ROTH  &  CLARK
INC.

CONSULTING  ENGINEERS

APR 30 1993      MARCH 1, 1993 (DRAFT)
APRIL 30, 1993 (FINAL)

## SECTION I

## SUMMARY, CONCLUSIONS AND RECOMMENDATIONS

### A. Summary

1. Project Plan Background

The City of Birmingham is served by a combined sewer system that overflows into the Rouge River during wet weather. Combined sewers carry both sanitary sewage and storm water in the same pipe. During certain wet weather conditions, these sewers overflow into the Rouge River with the mixture of sanitary sewage and storm water. These overflows are called Combined Sewer Overflows (CSOs). Federal Environmental Protection Agency (EPA) and the Michigan Department of Natural Resources (MDNR) requirements mandate that CSO controls be constructed to address CSO pollution.

This Project Plan for CSO control has been prepared for the Office of the Oakland County Drain Commissioner and the City of Birmingham by the engineering firm of Hubbell, Roth & Clark, Inc. The plan addresses the control of CSOs generated during wet weather in the combined sewer service area known as the Birmingham CSO Area.

The Birmingham Combined Sewer Overflow (CSO) Service Area includes the central portion of Birmingham as shown on Figure II-2. The receiving stream for CSOs from the study area is the main branch of the Rouge River. This Project Plan is part of a concurrent effort by fifteen CSO communities, Oakland County, Wayne County, MDNR, and EPA to address CSO pollution within the Rouge River basin and develop cost-effective and environmentally sound solutions for CSOs and other wet weather pollution problems. This cooperative effort is being administered and substantially funded by the Rouge River National Wet Weather Demonstration Project Grant.

In 1988, the Southeast Michigan Council of Governments (SEMCOG), published the Rouge River Remedial Action Plan (RAP) which presented a 20-Year, three phase program to address Rouge River pollution problems and to protect public health. Phase I includes monitoring and optimizing existing combined sewer systems and planning for CSO controls. Phase II includes implementation of CSO controls to eliminate untreated CSOs for the protection of public health. Phase III involves evaluating results of Phase II CSO controls and initiating further controls (if required) to meet water quality standards. In compliance with the Federal Clean Water Act, the MDNR prepared permits for communities in the Rouge River basin having combined sewers discharging into the river. The permits require control and treatment of these discharges or overflows to the river to a level consistent with the RAP Phase II goals as a minimum.

In October 1989, MDNR (through the Water Resources Commission) issued National Pollutant Discharge Elimination System (NPDES) Permits structured around this three phase RAP approach. The Permits included technical standards for large Retention Treatment Basin (RTB) storage facilities under Phase II and possible enlargement of the retention facilities for Phase III depending on the water quality impacts. The NPDES permits have gone through an extensive contested hearing process with MDNR, and concurrent proceedings in federal court in front of Judge John Feikens Wayne County concurrently solicited and obtained a federal Demonstration Grant of $46 million for planning, design, and study, and an additional $82 million was appropriated for construction of the CSO abatement projects as part of the Rouge River National Wet Weather Demonstration Project Additional annual appropriations of $80 million will be sought to provide funding up to 55%. The Oakland County CSO Abatement Program includes four of the demonstration projects which are eligible for partial funding through the Demonstration Grant.

The final NPDES Permit No. MI0025534 governing CSO discharges from the Birmingham CSO Area was issued in October, 1992 to the City of Birmingham which has the responsibility to implement the permit requirements. The Oakland County Drain

Commissioner is administering the CSO control project for the City of Birmingham. A copy of the NPDES Permit is included in this report as Appendix A.

The Project Plan has been prepared using the Project Plan Preparation Guidance outline provided by the State Revolving Fund (SRF) Administrative Rules. The SRF provides for financial assistance in the form of low interest loans. These rules call for compliance with the basic Federal Planning Requirements and the National Environmental Policy Act (NEPA). A final Project Plan serves as the basis for project prioritization and must be submitted by May 1 in order to be on the project priority list which takes effect on October 1 of that year.

2. Project Plan Analysis

The Birmingham CSO Study Area is served by combined sewers that collect both sanitary wastes and storm water runoff. Normal dry weather flow is directed to the Evergreen Interceptor by a multiple of regulators in Birmingham. The interceptor is part of the Evergreen–Farmington Sewage Disposal System operated by Oakland County. Combined Sewage that exceeds the capacity at the regulators overflows to the Rouge River, hence the name "combined sewer overflow."

The negative impact of CSOs on the Rouge River is well documented in the RAP and is discussed in detail in Section II–D of this report. The principal alternatives considered in the plan for eliminating, reducing, and/or treating CSOs were Sewer Separation and Retention Treatment Basins (RTBs).

Sewer Separation involves the construction of new storm or sanitary sewers to prevent the intermingling of sanitary wastes in the wet-weather discharges to the Rouge River. A complete separation is difficult to achieve. The removal of stormwater inflow sources that originate on private property such as foundations drains and sump pumps can be very expensive to remove. It may also be difficult to enforce their permanent removal from the sanitary system. Therefore, it was assumed that sanitary retention facilities would still be necessary as a part of this alternative.

Retention Treatment Basins for CSO control are storage facilities designed to capture and/or provide treatment of overflows. For the Birmingham CSO Area, the NPDES Permit requires the RTB to be based upon 30–minutes detention time for settling, skimming, and disinfection of the overflow generated by the one year-one hour storm (one-inch of rainfall in one hour). The facility must skim, settle, and disinfect any overflows that exceed the RTB storage volume. A preliminary layout of the RTB is shown on Figure III–1. An estimated 5.5 million gallon RTB, with approximately 4.5 miles of large diameter interceptor sewer, is the selected alternative for CSO control.

B. Conclusions

1. The control of CSO is being mandated by the MDNR through requirements in the NPDES Permit. The permit conditions reflect the terms of a settlement achieved by the Court Monitor under the guidance of Federal Court Judge John Feikens. The contested case hearing process lasted from October 1989 through October 1992. The revised final permit assumed in October 1992 prescribes more appropriate RTB sizing criteria for CSO control. Failure to comply with the conditions and compliance schedule stipulated in the permit could result in enforcement provisions of both State and Federal law.

2. CSO Control Facilities will provide a water quality benefit to the Rouge River, the lower Detroit River and western Lake Erie.

3. It is difficult to quantify the resulting water quality benefits due to variations that occur during wet weather conditions. There will still be water quality problems along the Rouge River due to the continued separate storm sewer discharges and other non-point source pollution. At a minimum, CSO control will: 1) remove floatables; 2) provide disinfection of the CSO prior to dis-

charge; and 3) provide settling to reduce sediment loading to the river.

4. CSO control can be accomplished by either construction of a retention treatment facility or by sewer separation.

5. The project cost of sewer separation is estimated to be $64.5 million. Construction of new sewers will cause significant disruption on public streets and still require a sanitary retention basin to reduce peak sanitary flows to the City's Purchase Capacity. The excess flows are caused by various inflow sources such as foundation drains.

6. An estimated 5.5 million gallon RTB is capable of providing 30 minutes detention of the runoff from a one-inch rainfall over one hour. The most cost-effective site for the RTB is on the City-owned Linden Park property. Approximately 24,000 feet of new large diameter interceptor sewers are required to consolidate the multiple existing CSO's at the proposed RTB site. The estimated project cost of this facility is $29.8 million.

7. CSO control can best be achieved by construction of a retention treatment basin, partial separation of the Fairway Drive and Northlawn Drive area, and the tributary interceptor sewers as presented in the Project Plan, Alternative 1. The RTB site and recommended improvements are shown in Figure I–1. The proposed interceptor sewer route and partial separation area are shown in Figure I–2.

| OAKLAND COUNTY CSO ABATEMENT PROGRAM | PRELIMINARY RETENTION TREATMENT BASIN LAYOUT | DATE MARCH 1, 1993 |
|---|---|---|
| HUBBELL, ROTH & CLARK, INC. CONSULTING ENGINEERS | BIRMINGHAM CSO AREA | FIGURE I-1 |

50

LEGEND

PROPOSED SEWER
EXISTING COMBINED TRUNK SEWERS
EXISTING SANITARY INTERCEPTOR
CITY LIMITS
COUNTY ROADS
DRAINS & INTERMITTENT STREAMS
PARTIAL SEPARATION AREA

| OAKLAND COUNTY CSO ABATEMENT PROGRAM | PROPOSED SEWER | DATE MARCH 1, 1993 |
|---|---|---|
| HUBBELL, ROTH & CLARK, INC. CONSULTING ENGINEERS | BIRMINGHAM CSO AREA | FIGURE I-2 |

8. The average annual combined sewer overflow volume will be reduced from approximately 227 million gallons per year (mgy) to approximately 74 mgy. The existing average number of over-flow events of 40–60 per year will be reduced to approximately 9–12 per year.

9. There are an estimated 10,000 residents population that contribute flow and would benefit from the CSO abatement program.

10. Due to the uncertainty of future Fed-eral appropriations, funding is as-sumed to range from 0% to 55% for planning and construction. The esti-mated average annual increase in user costs is projected to range from $63.96 per year to $137.76 per year based on a household with an $82,000 State Equalized Valuation, and as-suming a State Revolving Fund inter-est rate of two percent. Final deter-mination of Federal and State monies available, and actual user costs will be determined prior to construction in August, 1994.

C. Recommendations

1. The City of Birmingham should pass a resolution formally adopting the Pro-ject Plan and agreeing to implement the RTB alternative. This will comply with Phase II of the NPDES permit.

2. The Oakland County Drain Commis-sioner on behalf of the City of Bir-mingham should continue to pursue Federal grants through the Rouge River National Wet Weather Demon-stration Project and apply for a low interest loan under the FY 1994 SRF program for the remaining eligible costs. Ineligible local costs can be lo-cally financed through the Oakland County Drain Commissioner.

3. The City of Birmingham should contin-ue its involvement in ongoing pro-grams relating to water pollution con-trol on the Rouge River. In particu-lar, the City should be an active partic-ipant in the Rouge River National Wet Weather Demonstration Project.