**PURE WATERS INC.,** a not-for-profit corporation, Plaintiff,

v.

**MICHIGAN DEPARTMENT OF NATURAL RESOURCES, Roland Harms, Director; Oakland County Drain Commission, George W. Kuhn, Commissioner; Chapter 20 Birmingham Combined Sewer Overflow Drain Board, George W. Kuhn, Chairman; City of Birmingham, Thomas M. Markus, City Manager, Defendants.**

Civ. A. No. 94–74869.

United States District Court, E.D. Michigan, Southern Division.

April 21, 1995.

Jean Ligon, Ligon & Naber, Brighton, MI, David S. Bailey, Beaverdam, VA, for plaintiff.

John Scherbarth, Asst. Atty. Gen., Lansing, MI, for defendant MDNR.

Timothy J. Currier, P. Daniel Christ, Beier Howlett, P.C., Bloomfield Hills, MI, for defendant City of Birmingham.

Miller, Canfield, Paddock & Stone, Detroit, MI, for defendant Oakland County Drain Com'n and Chapter 20 Birmingham CSO Drain Bd.

## OPINION AND ORDER DENYING PLAINTIFF'S REQUEST FOR AN INJUNCTION

FEIKENS, District Judge.

### I. Background

The City of Birmingham, Michigan (Birmingham), the Oakland County Drain Commission and the Chapter 20 Birmingham Combined Sewer Overflow Drain Board are in the process of constructing a large retention basin (RTB) in Linden Park, a public park in Birmingham.[1] It is the approval of the Linden Park RTB by the regulatory agencies and Birmingham that led to the

---

1. 10% of the RTB is constructed. March 22, 1995, Injunction Hearing Tr. at II–150. At final argument defendant Birmingham said that it had already spent one million five hundred thousand dollars on the project.

filing of the complaint in this action. Defendants argue that the RTB is necessary because Birmingham has combined sewers that carry both storm water and waste water. On "dry weather days", when there is little or no precipitation or snow melt, sewage from Birmingham's combined sewers is transported to the Detroit Waste Water Treatment Plant via the Evergreen–Farmington Sewage Disposal Interceptor (Evergreen–Farmington Interceptor) and treated at that site.[2] On "wet weather days", days in which the amount of water exceeds the capacity of the Evergreen–Farmington Interceptor, due to precipitation or run-off, thirty-three overflow outfalls dump excess combined sewer wastewater into the Rouge River (River or Rouge). Discharging this CSO into the Rouge without treatment jeopardizes the health and welfare of the people in the communities on the Rouge, because the CSO contains elevated levels of disease causing organisms, human waste material, solid waste particles, fertilizer and toxic industrial waste. Simply preventing all discharge of CSO into the Rouge on wet weather days is no solution, since that would force the Evergreen–Farmington Interceptor to become congested and basement flooding, toilet-backups and other similar problems would occur. Instead, it is necessary to limit the amount of discharge of untreated CSO into the River as much as possible, without allowing the Evergreen–Farmington Interceptor to back-up. The RTB will accomplish this task by impounding the majority of the CSO and bleeding it back into the Evergreen–Farmington Interceptor on dry weather days. The remainder of the CSO will be treated and released into the Rouge. The parameters of the RTB are discussed further herein.

Defendant Michigan Department of Natural Resources (MDNR) is involved in this case for two reasons. First, under the mandate of the Clean Water Act (Act), 33 U.S.C. § 1251 *et seq.*, and as the agent of the Environmental Protection Agency (EPA), MDNR regulates the discharge of CSO. In fulfilling this duty MDNR issues National Pollution Discharge Elimination System (NPDES) permits. These permits require communities to follow the strictures of the Act as closely as possible, but recognize that complete and instantaneous elimination of pollution is impossible and, therefore, allow communities to discharge CSO into bodies of water when necessary. Second, MDNR is responsible for insuring that public and private entities follow federal and state environmental guidelines. This responsibility includes preparing Environmental Assessments (EA) and Findings of No Significant Impact (FONSI) after appraising proposed construction that may affect the environment.

Plaintiff is a not-for-profit membership organization composed primarily of citizens living in and around Birmingham. Members of Pure Waters, Inc. include citizens who live adjacent to Linden Park. Plaintiff's complaint states that the process leading to approval of the Linden Park RTB and defendant MDNR's EA and FONSI fail to meet the requirements of the National Environmental Policy Act (NEPA), 42 U.S.C. § 4331 *et seq.*, the Michigan Environmental Protection Act (MEPA), Michigan Compiled Laws §§ 691.1201 *et seq.*, applicable state and federal water quality standards under the Act, 33 U.S.C. § 1251 *et seq.*, and defendants' NPDES permit. In support of its request for an injunction, plaintiff alleges that it will suffer irreparable harm because defendants refused to evaluate water quality compliance for discharge of partially treated CSO under the Act and the NPDES permit, failed to observe chlorine standards under NEPA and MEPA, and violated NEPA and MEPA in refusing to assess groundwater problems at the Linden Park site and the feasibility of sewer separation.

Defendants proffer the following counterarguments: (1) plaintiff cannot meet the preliminary injunction standard; (2) plaintiff cannot show a significant environmental impact under NEPA; (3) plaintiff cannot establish a prima facie case under MEPA; and (4)

---

**2.** Birmingham's combined sewers are tributaries to four individual collection areas: the Birmingham CSO area; the Bloomfield CSO area; the Acacia Park CSO area; and the Twelve Towns CSO District. This Linden Park RTB only addresses CSO control for the Birmingham CSO area.

plaintiff's action is barred by the doctrine of laches.

On December 14, 1994, plaintiff moved for a temporary restraining order (TRO) to halt the construction of the RTB. At the hearing it became evident to me that plaintiff's objections were not substantial. It appeared that plaintiff's aim was to prevent the building of the RTB and to substitute therefor a system of separated sewers throughout Birmingham. Plaintiff also argued that construction of the RTB would increase pollution in the Rouge.

In an opinion dated December 23, 1994, 873 F.Supp. 41, I ruled that defendants considered the sewer separation alternative and rejected it for appropriate reasons and that plaintiff's concerns as to the discharge of water quality into the Rouge River were without foundation. I offered plaintiff an opportunity for a further hearing on its conjoined motion for a preliminary injunction. Plaintiff declined this offer. Plaintiff then appealed to the United States Court of Appeals for the Sixth Circuit and requested that that court stay the denial of the TRO, enjoin all activities pending appeal, and grant a TRO until I conducted a hearing on a preliminary injunction. Plaintiff's appeal was denied on January 19, 1995.

Subsequent to this denial, plaintiff filed a motion for a preliminary injunction.[3] On March 22, 1995, I heard plaintiff's motion. At a full evidentiary hearing plaintiff advanced essentially the same arguments to support an injunction that it offered to support a temporary restraining order.

Prior to examining the issues now raised, it is important that I again fully explain the process leading to approval of the Linden Park RTB. On October 19, 1989, the Michigan Water Resources Commission issued NPDES permits to the communities in the Rouge Watershed. The permits applied to combined sewer overflow discharges. All Rouge combined sewer overflow program re-

quirements were developed to reflect the goals of the Rouge River Remedial Action Plan (Rouge R.A.P.), that goal being the elimination of raw sewage discharges and protection of the public health by the year 2005.[4]

The Rouge R.A.P. established three phases for CSO control. The first phase was to operate, repair and maintain the existing facilities to minimize the discharge of raw sewage while planning was concluded for adequate control. Phase two required that CSO's be controlled to eliminate the discharge of raw sewage, and protect the public health by the year 2005.[5] Phase three requires that additional controls be applied, if necessary, to comply with water quality standards at times of discharge.

Thereafter, Detroit, Wayne and Oakland Counties filed a petition before me, requesting that I take jurisdiction over these permit questions. I ruled that I had pendent jurisdiction over the "time and manner in which the parties deal with wet weather flows governed by permit standards." I appointed Dr. Jonathan W. Bulkley of the University of Michigan as Court Monitor, to attempt to negotiate a settlement of these issues. While administrative hearings proceeded before the Water Resources Commission, Dr. Bulkley involved the contesting parties and the regulatory agencies in negotiations, which resulted in a settlement agreement dated June 28, 1991. The document was informally called the "Bulkley Settlement." In accordance with this settlement, the permits issued on October 19, 1989 were revised, and on August 20, 1992, these revised permits were reissued. If Birmingham does not comply with the terms of the NPDES permits, it will violate state and federal law and be subject to significant penalties.

In 1992 defendants began to pursue federal grants through the Rouge River National Wet Weather Demonstration project, apply for State Revolving Loan Fund low interest

---

3. Although plaintiff's motion is for a preliminary injunction, I will treat it as a motion for a permanent injunction.

4. The Rouge R.A.P. was published by the Southeast Michigan Council of Governments (SEMCOG) in 1988.

5. The Linden Park RTB will allow Birmingham to satisfy phase two of the Rouge R.A.P.

loans and gather proposals to build a system to control CSO. On March 1, 1993, Hubbell, Roth & Clark, Inc. Consulting Engineers (HR & C) submitted a draft proposal recommending the Linden Park RTB.

In May of 1993 an Ad Hoc Citizens Committee (Committee) appointed by the Birmingham City Commission began hearings on the Linden Park RTB.[6] It is not disputed that the Committee met over twenty times in the summer of 1993 to hear comments concerning the Linden Park proposal and other suggestions for rectifying the CSO problem. On July 22, 1993 the Committee heard testimony from individuals who supported the proposal plaintiff now supports. After reviewing the testimony, the Committee considered the environmental and economic impact of all the alternatives. The Committee then recommended the Linden Park RTB plan submitted by HR & C to the Birmingham City Commission. This public participation was a major factor in approving the Linden Park RTB. Evidence of this is the FONSI which states the following:

VII. PUBLIC PARTICIPATION
Public participation was the key issue in the evaluation of alternatives and was a critical element in the selection of the proposed project. Numerous newspaper articles have featured the project, along with the other CSO control projects in this area. Newsletters were mailed out and public meetings were held to discuss and inform residents of the project. The public hearing was held on March 29, 1993, at the Birmingham City Commission Room. A presentation was made of the project plan, including the alternatives considered, the environmental impacts anticipated, and the estimated costs. Significant opposition was voiced at this hearing, including concerns over the disruption of Linden Park, loss of property values, destruction of trees along the routes of the collecting sewers, and future requirements for CSO control. In an effort to optimize social acceptability and project implementability, the Citizen's

(sic) Advisory Committee, referenced earlier, was established. Following the additional evaluation, described previously, and solicitation of public input, using the committee as a forum to resolve concerns, a resolution was passed by the city commission approving and agreeing to implement the modified Linden Park alternative.

Michigan Department of Natural Resources, June 1, 1994, Finding of No Significant Impact at p. 23.

On October 19, 1993 MDNR notified Birmingham that the Linden Park plan satisfied the requirements of the NPDES permits. Based on that approval, and the recommendation of the Committee, the Birmingham City Commission passed a resolution approving the Linden Park plan.

MDNR continued to appraise the project to determine its impact on the environment. In May of 1994 MDNR completed its EA and shortly thereafter, on June 1, issued a FONSI which stated:

IX. REASONS FOR CONCLUDING NO SIGNIFICANT IMPACTS
The water quality benefits anticipated from this project are expected to outweigh the short-term adverse construction impacts. No long-term significant adverse impacts are associated with the project.

Michigan Department of Natural Resources, June 1, 1994, Finding of No Significant Impact at p. 23. Issuance of the FONSI initiated a public notice and comment period which ended July 1, 1994. A week later MDNR advised defendants that the Linden Park plan met all environmental requirements and was approved based on the EA, FONSI and public comments received during the comment period.

As is evident from the intense scrutiny the Linden Park RTB received, several alternative plans were considered. The two principal alternatives were the Linden Park RTB, which was approved, and a plan to separate the sewers,[7] the plan supported by plaintiff,

6. The committee consisted of seven citizens of Birmingham. Four of these citizens lived near the Linden Park site.

7. The term "separated sewers" refers to a sewage system which uses one set of sewers to carry storm water run-off and another set to carry human and industrial waste.

which was rejected. A brief description of the alternatives is necessary to illuminate the contentions of the parties.

The Linden Park RTB is connected to the combined sewers. Under this alternative eighty to eighty-five percent of the CSO from heavy rainfall events will be retained in the Linden Park RTB and bled back into the Evergreen–Farmington Interceptor on dry weather days. On exceptionally heavy wet weather days, known as one year/one hour storms,[8] CSO will be released into the Rouge.[9] This CSO will still pass through the RTB which will provide thirty minutes of detention, with skimming, settling and disinfection prior to discharge. When weighing the benefits of the system mentioned above, defendants also considered several additional factors, including, the amount of energy and chemical consumption, manpower needs, the discharge of chlorine into the Rouge, short-term construction, and cost, which the parties agree is $29,861,000.

Under the second alternative, all combined sewers in the Birmingham area would be separated. This would be accomplished by constructing new storm sewers to serve all existing storm water sources or constructing new sanitary sewers. In either case, approximately 200,000 feet of new sewer are required. This approach would eliminate all discharge of human and industrial waste into the Rouge. Untreated, contaminated stormwater run-off would flow directly into the Rouge, however.

Several problems are present in the plan to separate sewers. Construction would be required for two to three years in approximately eighty percent of Birmingham's streets. Many streets would be closed during construction and trees that have grown near sewage lines would be removed. In addition, records of sewage and utility upgrades in Birmingham are poor, and construction would have to be delayed to determine where the sewage system runs and how

to avoid utility lines. Sewer separation also requires excavation and construction on private property, which is significant because of the large number of easements that defendants would need to acquire.

The cost for this alternative varies according to the precise dimensions of the plan. If the plan called for new storm sewers, the cost would be $48,415,000. If new sanitary sewers were connected to each household, with footing drain removal, the cost reaches $64.5 million dollars. If new sanitary sewers were constructed with no footing drain removal, the cost would be $44.7 million dollars; but due to the absence of footing drains, this option still requires a 4.5 million gallon RTB at Linden Park.

## II. *Analysis*

### A. Injunction

 Plaintiff requests an injunction to halt construction of the Linden Park RTB. A federal court will issue an injunction when a party can show irreparable harm and inadequacy of legal remedies. *Weinberger v. Romero–Barcelo,* 456 U.S. 305, 312, 102 S.Ct. 1798, 1803, 72 L.Ed.2d 91 (1982). Prior to the grant of an injunction, "a court must balance the interests of the parties and give particular attention to the public consequences of a decree." *Charter TP. of Huron, Mich. v. Richards,* 997 F.2d 1168, 1175 (6th Cir.1993). "[A] substantial threat of impending injury is necessary to justify the imposition of an injunction." *Chem–Trend Inc. v. McCarthy,* 780 F.Supp. 458, 460 (E.D.Mich. 1991). As these cases illustrate, before issuing an injunction in this case I must decide that the likelihood of plaintiff sustaining irreparable harm is so great that it outweighs the public interest.

The public's interest in this case is substantial. First, due to the nature of this problem the public health is at risk if solutions are delayed. Second, halting construction may waste the one million five hundred

---

8. This means that one inch of rain will accumulate uniformly across the drainage area during one hour. *See* Birmingham CSO Area Project Plan, p. I–4.

9. A total of nine and a half-million gallons can be stored in the system. The RTB has a capacity of

five and a half-million gallons and an eleven foot tunnel that runs from Linden Park to Booth Park has a capacity of four million gallons. *See* March 22, 1995, Injunction Hearing Tr. at II–175.

thousand dollars defendants have already spent on the Linden Park project. Third, the Linden Park plan was approved by Birmingham only after citizens participated in the process by attending City Commission and Committee hearings on the subject. Fourth, time and money were spent researching, litigating and documenting the objectives and problems discussed in the EA, FONSI and the voluminous CSO project plan. Deference to the public interest demands that this court examine carefully any claim that will waste the public's time and money and that may place the health of citizens in jeopardy.

Plaintiff argues that it is irreparably harmed by construction of the Linden Park RTB because NEPA and MEPA were not followed during the approval stages. If these statutes were violated, such harm may outweigh the public's interest. An examination of the facts reveals the vacuity of plaintiff's argument, however.

**B. NEPA**

NEPA directs agencies to examine the environmental consequences of proposed projects and to provide statements which explain:

 (i) the environmental impact of the proposed action,

 (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

 (iii) alternatives to the proposed action,

 (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

 (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

*Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 348, 109 S.Ct. 1835, 1845, 104 L.Ed.2d 351 (1989); 42 U.S.C. § 4332(C). "NEPA itself does not mandate particular results, but simply prescribes the necessary process. If the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs." *Methow Valley Citizens Council,* 490 U.S. at 350, 109 S.Ct. at 1846 (citations omitted). An agency must determine whether an environmental impact statement is necessary after preparing an EA and issue a FONSI if the agency decides not to prepare an environmental impact statement. 40 C.F.R. § 1501.4(c), (e).

In this case defendant MDNR prepared an EA which met all the requirements listed in 42 U.S.C. 4332(C). After a public comment period MDNR issued a FONSI. These two actions satisfy NEPA. 40 C.F.R. § 1501.4(c), (e). Plaintiff wants to quarrel with the findings in the documents by pointing to the amount of chlorine that will be released into the Rouge, possible groundwater problems, resulting water quality and the feasibility of sewer separation. While defendants' conclusions are not to plaintiff's liking, it is clear from the voluminous materials filed with this Court, that defendant MDNR, with the assistance of the other defendants and the citizens of Birmingham, did consider potential problems associated with the Linden Park RTB plan and possible alternatives. *See* March 22, 1995, Injunction Hearing, Tr. at II–108; EA p. 6–9; Birmingham CSO Area Project Plan §§ III–VI; Minutes, Ad Hoc Citizens Advisory Committee Meetings, May 12, 1993, July 8, 1993, July 22, 1993. Defendant MDNR and the other parties simply concluded that any possible negatives associated with the proposal were greatly outweighed by the positive attributes of the Linden Park RTB. This is acceptable under NEPA. *Methow Valley Citizens Council,* 490 U.S. at 350, 109 S.Ct. at 1846. Thus, defendants' actions satisfy the requirements of NEPA in form and in substance.

**C. MEPA**

Plaintiff's MEPA claim is also without merit. MEPA "imposes a duty on individuals and organizations ... to prevent or minimize degradation of the environment which is caused or is likely to be caused by their activities." *Ray v. Mason County Drain Comm'r,* 393 Mich. 294, 306, 224 N.W.2d 883 (1975). Under MEPA, the trial

court must conduct a dual inquiry to determine whether plaintiff can establish a prima facie case: (1) whether a natural resource is involved; and (2) whether the impact of the activity on the environment rises to the level of impairment. *Kent Rd. Comm. v. Hunting,* 170 Mich.App. 222, 233, 428 N.W.2d 353 (1988). "In answering the latter question, the trial court should evaluate the environmental situation before the proposed action and compare it with the probable condition after [the action is implemented]." *Id.* at 233, 428 N.W.2d 353. The word "impair", in this context, means "[t]o weaken, to make worse, to lessen in power, diminish, or relax or otherwise affect in an injurious manner." *Michigan United Conservation Clubs v. Anthony,* 90 Mich.App. 99, 105, 280 N.W.2d 883 (1979) (emphasis omitted).

Construction of the Linden Park RTB will improve the quality of water in the Rouge dramatically. The RTB will reduce the number of CSO events from forty to sixty times per year to approximately six to nine per year. Currently two hundred twenty million gallons per year of combined sewage are dumped into the Rouge; the RTB will reduce this figure to about forty-three million gallons per year. Thus, when the RTB is complete, eighty percent of overflow volumes will be captured. The small amount of CSO that is not captured will be treated prior to being dumped into the Rouge. Therefore, the Rouge will be significantly cleaner after the RTB is constructed than it is now.

Despite this fact, plaintiff contends that the RTB will impair the environment. Therefore, an examination of those factors which plaintiff deems adverse effects is necessary. *Kent Rd. Comm.,* 170 Mich.App. at 233, 428 N.W.2d 353. The primary adverse impact, according to plaintiff, is the discharge of approximately eight hundred sixty gallons of sodium hypochlorite into the Rouge per year. It is undisputed, however, that defendants considered this factor and arranged for testing to assure that the chlorine discharge complies with applicable standards and designed the RTB so that it can accommodate dechlorination equipment. Another effect of the RTB is short-term damage to Linden Park. This damage is limited to the construction period and will not be noticeable after landscaping. For example, although two hundred trees must be removed during construction, landscaping plans call for the planting of four hundred trees and two hundred bushes. When comparing the minimal "adverse" effects of the RTB to its beneficial impact, it is obvious that plaintiff's reasoning turns MEPA on its head.[10] In short, there is no evidence that the Linden Park RTB will "impair" the environment. Therefore, plaintiff cannot establish a prima facie case under MEPA.[11]

**10.** In view of this finding the court notes nonetheless that a contention can be made that MEPA is preempted by federal laws which regulate water pollution.

**11.** At the hearing plaintiff spent a considerable amount of time attempting to show that sewer separation was a more feasible and prudent alternative than the Linden Park RTB because of an artesian aquifer at the site. Due to the fact that plaintiff cannot establish a prima facie case under MEPA, it is unnecessary for defendants to explain why sewer separation is not a feasible and prudent alternative. *Ray,* 393 Mich. at 312, 224 N.W.2d 883. This said, I will briefly discuss plaintiff's claim to show that defendants did consider the effect of the artesian aquifer on the RTB.

According to plaintiff the small artesian aquifer might be connected to a much larger artesian aquifer. If this is true, and the larger aquifer is punctured by construction, the water pressure in the well may cause the soil surrounding the basin to collapse and water would rush into the area surrounding the RTB. This effect, called a "blow-out" condition, would mean that the RTB would eventually "float" in water. Plaintiff believes this is important because such a scenario would drastically increase the cost of the RTB and thus, make sewer separation a more economically viable alternative than the RTB.

Uncontroverted testimony shows that plaintiff's "doomsday" scenario is unlikely to occur. Four test boring holes were dug at the Linden Park site to test soil composition. One of these boring holes is an observation well which monitors water pressure. At this time "de-watering" is taking place in that well at the pace of ten gallons a minute. This fact leads defendants, and this court, to believe that there is little chance of a blow-out occurring at the site. *See* March 22, 1995, Injunction Hearing Tr. at II–123. Despite this conclusion, defendants have taken the precautionary measure of providing an even larger on-site de-watering system which will pump up to 200 gallons per minute. *See* March 22, 1995, Injunction Hearing, Tr. at I–73 and II–119. Thus, plaintiff's contention is without merit.

**D. Public Interest**

Due to the fact that building the Linden Park RTB does not violate NEPA or MEPA, plaintiff's claim of irreparable harm is without merit. Therefore, the public interest in allowing construction of the Linden Park RTB easily outweighs the alleged harm plaintiff will suffer if an injunction is not issued. For this reason I refuse to issue an injunction in this case.

**E. Laches**

Due to the disposition of the injunction in this manner, discussion of defendants' laches defense is unnecessary.

**III. *Conclusion***

Accordingly, plaintiff's motion for an injunction is DENIED and construction of the Linden Park Retention Basin will proceed as scheduled. IT IS SO ORDERED.